UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA ex rel
MC2 SABTECH HOLDINGS, INC.,
d/b/a IXI TECHNOLOGY, INC.,

                    Plaintiffs and Relator,

v.

GET ENGINEERING CORP., GUILLE
E. TUTTLE, RODNEY TUTTLE, GREG
MACNEIL, DAVID GRUNDIES,
LESLIE ADAMS,

                    Defendants.

Case No.:  19-CV-1249 TWR (AGS)

**ORDER (1) DENYING RELATOR'S
MOTION FOR SUMMARY
JUDGMENT, AND (2) GRANTING
IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

(ECF Nos. 101, 102)

Presently before the Court are the cross-motions for summary judgment (the "Motions") filed by Plaintiff-Relator MC2 Sabtech Holdings, d/b/a IXI Technology, Inc. ("IXI") ("Rel.'s MSJ," ECF No. 101) and Defendants GET Engineering Corporation ("GET"), Rodney Tuttle, Greg MacNeil, David Grundies, and Leslie Adams ("Defs.' MSJ," ECF No. 102).  The Motions are fully briefed, (*see* ECF Nos. 107–111, 113–114), and the Court held a hearing on November 10, 2021.  (*See* ECF No. 112.)  Having carefully considered the Parties' arguments, the record, and the applicable law, the Court **DENIES** Relator's Motion for Summary Judgment and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment as follows.

1

# BACKGROUND

## I.   Statutory and Regulatory Background

Relator generally alleges that, between August 9, 2009, and December 10, 2015 (the "relevant time period"), Defendants falsely represented that GET was a Women-Owned Small Business ("WOSB") to obtain contracts with the federal government and prime contractors to which it was not entitled.  (*See generally* ECF No. 1 ("Compl.").)  Although not provided by the Parties, an overview of the statutory and regulatory framework incentivizing procurement contracts with WOSBs is critical to understanding Relator's claims and the Parties' arguments.

Congress enacted the Small Business Act of 1953 with "the declared policy . . . that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise . . . and to maintain and strengthen the overall economy of the Nation."  *See* PL 83-163 § 202, 67 Stat. 230, 232 (codified as amended at 15 U.S.C. § 631(a)).  One of the means identified by Congress was "to insure that a fair proportion of the total purchases and contracts or subcontracts for supplies and services for the Government be placed with small-business enterprises."  *See id.*  To carry out its identified policies, Congress created the Small Business Administration ("SBA").  *See* PL 83-163 § 204(a), 67 Stat. 230, 233 (codified at 15 U.S.C. § 633(a)).

In 1978, Congress enacted a policy to ensure greater participation of small businesses in federal procurement contracts by establishing annual goals for the percentage of the total value of all prime and subcontract awards.  *See* Act to Amend the Small Business Act and the Small Business Investment Act of 1958, PL 95-507, 92 Stat. 1757 (1978) (codified at 15 U.S.C. § 644(g)).  In 1994, Congress added an annual five-percent goal for small business concerns owned and controlled by women (the "WOSB Goal"). *See* Federal Acquisition Streamlining Act of 1994 ("FASA"), PL 103-355 § 7106, 108 Stat. 3243, 369 (codified as amended at 15 U.S.C. § 644(g)(1)(A)(v) ("The Governmentwide goal for participation by small business concerns owned and controlled by women shall be

2

established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year.")).  For purposes of FASA, Congress defined "a small business concern owned and controlled by women" as requiring "(1) at least 51 percent of [the] small business concern is owned by one or more women or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and (2) the management and daily business operations of the business are controlled by one or more women." *Id.* (codified at 15 U.S.C. § 632(n)).

"The [WOSB G]oal was implemented by procurement regulations effective in fiscal year 1996[,]" *see* United States General Accounting Office, GAO-01-346, Federal Procurement: Trends and Challenges in Contracting With Women-Owned Small Businesses 8 (2001), https://www.gao.gov/assets/gao-01-346.pdf; *see also, e.g.*, Federal Acquisition Regulation; Small Business, 60 Fed. Reg. 48258-02, 48261 (Sept. 18, 1995) (to be codified at 48 C.F.R. § 19.202-5), and the legislative history of FASA "indicated that the 5-percent [WOSB G]oal was not intended to create a new set-aside or program of restricted competition for WOSBs." *See* GAO-01-346 at 8; *see also* United States Government Accountability Office, GAO-19-168, Women-Owned Small Business Program: Actions Needed to Address Ongoing Oversight Issues 26 (2019), https://www. gao.gov/assets/gao-19-168.pdf ("Federal dollars obligated for contracts to all women-owned small businesses . . . include contracts for any type of good or service awarded under the WOSB program, under other federal programs, or through full and open competition."). Although the general twenty-three percent procurement goal for all types of small businesses has been met consistently since Fiscal Year 2013, the WOSB Goal has only been achieved twice, in Fiscal Years 2015 and 2019.  *See* Robert Jay Dilger, Cong. Rsch. Serv., R46322, SBA Women-Owned Small Business Federal Contracting Program 8–9 (2021).

Another means Congress has used to help small businesses receive a fair proportion of federal contracts and subcontracts are various contracting preferences, such as "restricted competitions (set-asides), sole source awards, and price evaluation

3

adjustment/preference in unrestricted competitions[.]" *See id.* at 1; *see also id.* at 10 & n.30 (discussing programs available to small businesses owned and controlled by socially and economically disadvantaged individuals and small businesses located in historically underutilized business zones). Slow progress in achieving the five-percent WOSB Goal led some to advocate for the creation of a new set-aside program for WOSBs (the "WOSB Program"). *See id.* at 10. Accordingly, the WOSB Program was authorized by the Equity in Contracting for Women Act of 2000, H.R. 4897, 106th Cong. (2000), which was incorporated into the Small Business Reauthorization Act of 2000, itself enacted within the Consolidated Appropriations Act, 2001. PL 106-554, 114 Stat. 2763 (codified as amended at 15 U.S.C. §§ 647g, 657d–657e).

The WOSB Program "authorizes the contracting officers to restrict competition to eligible . . . WOSBs for federal contracts in industries in which the SBA determines that women-owned small businesses are underrepresented or substantially underrepresented in federal procurement." *See* Anna S. Molina, *The Sisyphean Course of Combating Gender Discrimination in the Federal Marketplace for Prime Contracts: Rolling the Boulder of Small Business Size*, 22 Cardozo J.L. & Gender 109, 126 (2015); *see also* 48 C.F.R. § 2.101 (eff. Apr. 1, 2011) ("Women–Owned Small Business (WOSB) Program means a program that authorizes contracting officers to limit competition, including award on a sole source basis, to . . . WOSB concerns eligible under the WOSB Program for Federal contracts assigned a NAICS code in an industry in which SBA has determined that WOSB concerns are substantially underrepresented in Federal procurement."). For purposes of the WOSB Program, "[t]he term 'small business concern owned and controlled by women' has the meaning given such term in section 632(n) of this title, except that ownership shall be determined without regard to any community property law." § 811, 114 Stat. 2763 (codified at 15 U.S.C. § 637(m)(1)(B)). The statute allowed "a contracting officer [to] restrict competition for any contract for the procurement of goods or services by the Federal Government to small business concerns owned and controlled by women" under certain circumstances, *see id.* (codified at 15 U.S.C. § 637(m)(2)), and required the SBA

4

Administrator to "establish procedures" to verify eligibility for the WOSB Program.  *See id.* (codified at 15 U.S.C. § 637(m)(5)).

"[T]he WOSB [P]rogram's implementation was delayed for over 10 years, primarily due to the SBA's difficulty in identifying an appropriate methodology to determine 'the industries in which WOSBs are underrepresented (and, by inference, substantially underrepresented) with respect to federal procurement contracting.'"  Dilger, *supra*, at 14.  On October 7, 2010, the SBA finally implemented regulations effectuating the WOSB Program.  *See* Women-Owned Small Business Federal Contract Program, 75 Fed. Reg. 62258-01, 62282–91 (Oct. 7, 2010) (to be codified at 13 C.F.R. §§ 127.100–127.700).  Among other things, these regulations provided the requirements to qualify as a WOSB for purposes of the WOSB Program, *see* 13 C.F.R. §§ 127.200–127.203, and the requirements for certification of WOSB status for purposes of the WOSB Program.  *See* 13 C.F.R. §§ 127.300–127.305.

The Federal Acquisition Regulation ("FAR") amended its definition of WOSB in 2011, distinguishing between those entities eligible for inclusion in the WOSB Goal as opposed to those eligible for the WOSB Program:

Women-owned small business concern means—

(1)     A small business concern—

(i)     That is at least 51 percent owned by one or more women; or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(ii)    Whose management and daily business operations are controlled by one or more women; or

(2)     A small business concern eligible under the Women-Owned Small Business Program in accordance with 13 CFR part 127 (see subpart 19.15).

48 C.F.R. § 2.101.  Further, the SBA recently clarified that "[a] concern must be certified as a WOSB . . . pursuant to § 127.300 in order to be awarded a WOSB . . . set-aside or sole-source contract," *see* 13 C.F.R. § 127.200(c)(1), but that "[o]ther women-owned small

business concerns that do not seek WOSB . . . set-aside or sole-source contracts may continue to self-certify their status, receive contract awards outside the Program, and count toward an agency's goal for awards to WOSBs." *See* 13 C.F.R. § 127.200(c)(2).

## II.  Undisputed Material Facts

The Parties have agreed to the following undisputed material facts:

"GET's ownership split of 51% Guille Tuttle, and 49% to her husband Rodney Tuttle has remained unchanged since 1982, with no other owners or shareholders." (ECF No. 109 ("Jt. Stmt.") ¶ 1.)  "From the mid-1980s to present GET was located at 9350 Bond Avenue, El Cajon, California." (*Id.* ¶ 2.)  "Between August 9, 2009 to December 10, 2015, GET supplied tactical data equipment and interfaces to the Navy and prime government contractors such as Raytheon Company, Northrop Grumman, Lockheed Martin, and DRS Laurel Technologies, among others." (*Id.* ¶ 3.)

"Between August 9, 2009[,] to December 10, 2015, GET had officer positions of CEO/President, Vice President, Chief Financial Officer, Treasurer and Secretary." (*Id.* ¶ 14.)  "Sometime in 1997, Mrs. Tuttle was no longer CEO due to health issues associated with lupus." (*Id.* ¶ 7.)  Accordingly, "[s]tarting sometime in 1997, men served as GET's CEO until December 10, 2015." (*See id.* ¶ 9; *see also id.* ¶ 10.)  "After Mrs. Tuttle was no longer CEO sometime in 1997, GET hired Bob Ruhe to succeed her as CEO, and he served as CEO from sometime in 1997 to sometime in 2003." (*Id.* ¶ 8.)  "On December 1, 2003, GET hired Greg MacNeil to serve as both its President and CEO." (*Id.* ¶ 11; *see also id.* ¶ 13.)  "During Mr. MacNeil's employment with GET from December 1, 2003[,] to January 3, 2012[,] GET's filings with the California Secretary of State identified Mr. MacNeil as its President and CEO." (*Id.* ¶ 12.)  "On January 3, 2012, GET appointed David Grundies, who was then serving as Vice President and reporting to Mr. MacNeil, to succeed Mr. MacNeil as President and CEO." (*Id.* ¶ 16.)

"In December of 1986, GET hired [Ms.] Leslie Adams[,] who worked for GET for 35 years straight." (*Id.* ¶ 4.)  "GET hired Ms. Adams approximately three years after she graduated from high school." (*Id.* ¶ 5.)  "Ms. Adams does not have a college degree." (*Id.*

6

¶ 6.)  "Between August 9, 2009[,] to December 10, 2015, GET's then serving male CEOs conducted the performance reviews of Ms. Adams."  (*Id.* ¶ 15.)

"On or about August 9, 2009, GET represented to the U.S. Government and prime contractors that it was a WOSB, as defined by FAR 2.101."  (*Id.* ¶ 17.)  "Mr. MacNeil, as CEO, and Ms. Adams, as General Manager, made the initial decision to hold GET out as a WOSB."  (*Id.* ¶ 19.)  "On August 31, 2009, GET's then CEO, Mr. MacNeil, informed GET's Board of Directors during his presentation to the Board that 'GET announced to our customers that we are now a Small Business, Woman-Owned Corporation as defined by the United States Federal Acquisitions Regulations (FAR) 2.101.'"  (*Id.* ¶ 20.) Accordingly, "GET represented itself as a WOSB on its website from August 9, 2009[,] to December 10, 2015."  (*See id.* ¶ 21.)  "At the time the decision was made to hold GET out as a WOSB, Mr. Tuttle and Mrs. Tuttle were both members of the Board of Directors."  (*Id.* ¶ 22.)

"As part of the representations and certifications that GET submitted to the federal Government, Leslie Adams certified on behalf of GET that:

> 'I have read each of the FAR and DFARS provisions presented below.  By submitting this certification I, Leslie Adams, am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table.  I understand that I may be subject to penalties if I misrepresent Get Engineering Corp. in any of the below representations or certifications to the Government.'"

(*Id.* ¶ 23.)  "On March 28, 2012, Ms. Adams, on behalf of GET, inquired informally via e-mail with the [Small Business Administration ("SBA")] regarding the WOSB subject. Specifically, Ms. Adams wrote Ms. Rosa Rodarte and stated:

> 'Our company has been in business for 30 years and we are a Women Owned Small Business in El Cajon.  For many years we have been registered on the Government Central Contracting Registrations (CCR) and ORCA as a Women Owned Small Business and recently a SBA form 2413 has been brought to our attention which is I believe . . . the form needed for WOSB Program Certification.  On that form it asks if we have been certified by the

1        SBA as a WOSB.  Is that a step that we should be doing before filling out this
2        form and if so how do we go about getting certified by the SBA?'"

3  (*Id.* ¶ 24.)  Additionally, "[i]n or around June, 2012, GET had communications with [the
4  Procurement Technical Assistance Centers ("PTAC")] about the WOSB Program through
5  the SBA."  (*See id.* ¶ 25.)  "After the meeting with PTAC, Mr. MacNeil stated in a
6  companywide email:

7        'It was obvious that he [PTAC] became somewhat confused about how we fit
8        inside the new rules.  After further discussion he advised us to go direct to the
         SBA who were the people that sent us to PTAC.  Something like a circle game.

9
10        We will continue to operate as a WOSB until we get further clarity on how to
          get through this third party certification.  We have never applied for or won a
11        WOSB set aside since most of those go to service[-]oriented companies rather
12        than manufacturers like GET.'"

13  (*Id.* ¶ 26 (first alteration in original).)

14        "After meeting with PTAC, Mr. MacNeil decided to continue to operate as a WOSB
15  until they got further clarity on how to get through third party certification as a WOSB."
16  (*Id.* ¶ 27.)  "Following the discussion with PTAC in June of 2012, GET did not approach
17  the SBA to inquire into the issues further and continued representing that GET was a
18  WOSB to the Government and prime contractors."  (*Id.* ¶ 28.)  "Ms. Adams put the
19  concerns regarding GET's WOSB status on the 'back burner' because Mr. MacNeil
20  became ill."  (*Id.* ¶ 29.)

21        "On November 17, 2015, the SBA notified GET that the agency would 'be
22  performing an Eligibility Examination on [GET] to verify its status as a Women-Owned
23  Small Business . . . .'"  (*Id.* ¶ 30 (alterations in original).)  "On November 18, 2015, Leslie
24  Adams emailed Joshua Waddell, GET's IT manager, and asked him to change GET's
25  website from 'GET is a Woman Owned Small Business (WOSB) . . . .' to 'GET is a Small
26  Business Woman Owned . . . .'"  (*Id.* ¶ 31 (alterations in original).)  "On December 10,
27  2015, GET terminated Mr. Grundies' employment."  (*Id.* ¶ 32.)

28  / / /

Although the relevant time period ends December 10, 2015, (*see* ECF No. 102-1 ("Defs.' Mem.") at 1), the Parties also agreed to the following undisputed facts, which the Court includes for the sake of completeness:

"On December 28, 2015, GET amended its corporate filing with the California Secretary of State and listed Mrs. Tuttle as the CEO." (*Id.* ¶ 33.) "GET unchecked the box that it was a WOSB on [the United States' System for Award Management ("SAM")] as of January 19, 2016 (available at www.sam.gov)." (*Id.* ¶ 18; *see also id.* ¶ 34.) "On June 17, 2016, one of GET's prime contractor customers, AMSEC Huntington Ingalls, acting through employee Turin Pollard, identified the change in GET's status on SAM and emailed Leslie Adams stating that GET's 'attachment [GET Corporate Capabilities sheet] lists GET Engineering as a WOSB, however your SAM.Gov profile doesn't have that checked. Which is correct?'" (*Id.* ¶ 35 (alteration in original).) "On the same day, Ms. Adams responded that '[u]p until a few months ago we did not meet the Small Business Administration WOSB definition needed to be self-certified. Only recently did that change because Mrs. Guille Tuttle, the majority stockholder of our company is now interim CEO. Until the decision on that position is made we are holding off on filing the paperwork and can only state that we are a Small Business Women Owned.'" (*Id.* ¶ 36.) "On June 17, 2016, Mr. Pollard responded and stated that 'We're going to have to list you as an SM for the prop, unless you decide to change your certification before we submit. That said, please let us know as soon as you do change it, so we can track out socio-economic groups after award.'" (*Id.* ¶ 37.)

"On September 28, 2016, James Burgess, Administrative Project Manager at DDL OMNI Engineering LLC, one of GET's customers, emailed Leslie Adams and stated '[t]he questionnaire that was filled out [for DDL OMNI Engineering LLC] indicated that you are a Women-Owned Small Business but the FAR&DFARS report on SAM.GOV report indicates you are not. . . . In order to ensure our records are correct, please clarify the discrepancy between the two.'" (*Id.* ¶ 38 (alterations in original).) "That same day, Ms. Adams responded, '[t]he majority owned Shareholder and interim CEO is a woman so we

consider ourselves a Small Business Women Owned.  To meet the Small Business definition of Woman Owned Small Business (WOSB) and be certified 'the Woman' must run the same day to day operations which is what we currently are doing.  The reason we have not applied to be self-certified with SBA is because our CEO is only interim and we aren't sure if the CEO position will be held by another man or woman so we haven't proceeded with a change.'"  (*Id.* ¶ 39 (alterations in original).)

"On October 5, 2016, IXI submitted a supplemental disclosure to the Navy."  (*Id.* ¶ 40.)  "On November 15, 2016, IXI, through counsel, met with representatives of the Navy to provide information regarding GET's claimed WOSB status."  (*Id.* ¶ 41.)   "On November 21, 2016, GET changed its SAM representation to represent and certify that it was a WOSB."  (*Id.* ¶ 42.)  "On December 22, 2016, IXI, through counsel, notified the Navy that GET had 'changed its SAM certification, yet again, this time certifying that it is a WOSB.'"  (*Id.* ¶ 43.)

"On January 13, 2017, the Navy issued GET a 'Show Cause' Letter indicating that the Navy was considering taking administrative action, including suspension and debarment, under FAR Subpart 9.4 regarding its use of the WOSB designation."  (*Id.* ¶ 44.) "The letter from the Navy's SDO stated: 'Given the special consideration in the Federal contracting award process that comes with WOSB status, I am concerned with GET's relatively frequent changes in WOSB status over the previous three years.'"  (*Id.* ¶ 45.) "The Navy letter further asked GET to address the following questions:

> (1)     Clarify if GET is currently a WOSB as defined in 13 C.F.R. 127 and explain GET's rationale for claiming WOSB status.
>
> . . .
>
> (7)     Address when and why GET's website was updated from Woman Owned Small Business (WOSB) to Small Business Woman Owned."

(*Id.* ¶ 46 (alterations in original and internal quotation marks omitted).)

"A meeting was held between GET and Navy officials on April 11, 2017."  (*Id.* ¶ 47.)  "On April 14, 2017, the Navy issued a 'Follow-Up' letter to GET[,]" (*id.* ¶ 48), and

"determined that GET was not eligible to claim the WOSB designation." (*Id.* ¶ 49.) "As part of the Navy's determination and directed corrective actions, GET was required to cease use of the WOSB designation and to notify all of its active customers that it was not a WOSB." (*Id.* ¶ 50.)

"In mid-2017, GET changed its website to state 'GET is a Small Business . . .' and removed verbiage that stated 'GET is a Small Business Woman Owned.'" (*Id.* ¶ 51 (alteration in original).) "On or around May 8, 2017, GET changed its SAM representation to state that it was not a WOSB." (*Id.* ¶ 52.)

## III.  Relevant Procedural History

Relator initiated this action on February 16, 2018, by filing this *qui tam* action *in camera* and under seal against Defendants—including, at that time, Mrs. Tuttle—in the United States District Court for the Central District of California.  (*See generally* ECF No. 1.)  Relator's initial and operative Complaint alleged three causes of action for violations of section 3729 of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, for (1) presentation of false claims under section 3729(a)(1)(A), (2) making or using a false record or statement under section 3729(a)(1)(B), and (3) conspiracy under section 3729(a)(1)(C), as well as a fourth cause of action for violation of sections 1833(a) and (c)(3) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989) (codified at various sections of 12 and 15 U.S.C.).  (*See generally* ECF No. 1.)

After the United States declined to intervene, (*see generally* ECF No. 12), the Honorable Josephine L. Staton unsealed the action and ordered Relator to serve its Complaint on Defendants.  (*See generally* ECF No. 13.)  On May 8, 2019, Defendants moved to transfer this action to this District.  (*See generally* ECF No. 39.)  Judge Stanton granted Defendants' motion on June 20, 2019, (*see generally* ECF No. 42), following which this action was transferred to this District and assigned to the Honorable Larry Alan Burns.  (*See generally* ECF Nos. 43, 44.)

/ / /

11

Defendants answered Plaintiff's Complaint on July 22, 2019, (*see generally* ECF No. 46), at which point the Parties proceeded to engage in discovery.  (*See generally* ECF No. 48.)  Defendants informed the Court on February 24, 2020, that Mrs. Tuttle had passed away, (*see generally* ECF No. 64), following which Mr. Tuttle was designated as her substitute.  (*See generally* ECF Nos. 74, 79, 82.)

This action was transferred to the undersigned on November 2, 2020.  (*See generally* ECF No. 87).  The Parties filed the instant Motions on May 14, 2021.  (*See generally* Motions.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment as to a claim or defense or part of a claim or defense.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Although materiality is determined by substantive law, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986).  A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  When considering the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party.  *Celotex*, 477 U.S. at 323.  The moving party may meet this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Id.*  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'"

/ / /

1   *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)
2   (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

3       Once the moving party satisfies this initial burden, the nonmoving party must
4   identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S.
5   at 324. This requires "more than simply show[ing] that there is some metaphysical doubt
6   as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,
7   586 (1986). Rather, to survive summary judgment, the nonmoving party must "go beyond
8   the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories,
9   and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder
10  to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *see also Anderson*,
11  477 U.S. at 248. Accordingly, the non-moving party cannot oppose a properly supported
12  summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading."
13  *Anderson*, 477 U.S. at 256.

## ANALYSIS

15      Through the instant Motions, Relator and Defendants each seek summary
16  adjudication in their favor as to Relator's first three causes of action under the FCA.[1] (*See*
17  Rel.'s MSJ at 1; Defs.' MSJ at 2.) Relator alternatively seeks partial summary adjudication
18  in its favor as to certain elements of its FCA causes of action. (*See* Rel.'s MSJ at 2–4.)
19  The Court begins, as it must, by addressing Defendants' purported jurisdictional challenge
20  before turning to the Parties' arguments concerning the merits of Relator's FCA claims.

21  **I.   The Public Disclosure Bar**

22      Defendants contend that this Court lacks jurisdiction over Relator's FCA claims
23  under the FCA's public-disclosure bar, 31 U.S.C. § 3730(e)(4). (*See generally* Defs.'

---

[1] Although Defendants also sought summary adjudication in their favor as to Relator's fourth cause of action for violation of FIRREA, (*see* Defs.' MSJ at 2), Relator withdrew this claim in its Opposition to Defendants' Motion for Summary Judgment. (*See* ECF No. 108 ("Rel.'s Opp'n) at 36 n.8.) Accordingly, the Court **DISMISSES** Relator's fourth cause of action without addressing Defendants' arguments on the merits.

Mem. at 30–35.)   Although the Parties briefed the application of the 1986-version of Section 3730(e)(4), (*compare, e.g.*, Defs.' Mem. at 31, *with, e.g.*, ECF No. 108 ("Rel.'s Opp'n") at 29), the Court noted at the hearing that relevant statutory provision was amended extensively effective March 23, 2010, and that the relevant time period spans from August 9, 2009, when GET first began representing itself as a WOSB, until December 10, 2015.  (*See* ECF No. 101-1 ("Rel.'s Mem.") at 6.)  This overlap is critical because, among other things, the 2010 amendments removed the jurisdictional language from Section 70(e)(4)(A), "making the public disclosure bar an affirmative defense rather than a matter of jurisdiction."  *Silbersher v. Allergan Inc.*, 506 F. Supp. 3d 772, 788 (N.D. Cal. 2020) (citing *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir.), *cert. denied*, 137 S. Ct. 2309 (2017)), *motion to certify appeal granted*, No. 18-CV-03018-JCS, 2021 WL 292244 (N.D. Cal. Jan. 28, 2021).  The Court therefore requested that the Parties submit supplemental briefing as to which version of the statute applies.  (*See* ECF No. 112.)

In their Supplemental Briefs, the Parties agreed that "the 1986 version of Section 3730(e)(4) applies to any alleged false claims occurring before March 23, 2010, and the 2010 version of Section 3730(e)(4) applies to any alleged false claims made after March 23, 2010."  (*See generally* ECF No. 113 ("Defs.' Supp. Br."); ECF No. 114 ("Rel.'s Supp. Br."); *see also, e.g.*, *United States ex rel. Savage v. CH2M Hill Plateau Remediation Co.*, No. 4:14-CV-5002-EFS, 2015 WL 5794357, at *10 (E.D. Wash. Oct. 1, 2015) (citing *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946 (1997)).)  But as Relator notes, (*see* Rel.'s Supp. Br. at 2), the earliest purchase order in the record is from April 23, 2010.  (*See* ECF No. 101-46 ("Ex. 45") at 1878; ECF No. 101-47 at 1890.)  Accordingly, only the 2010 version of the public disclosure bar applies based on the current record.

As amended effective March 23, 2010, the public disclosure bar provides:

(A)     The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--

/ / /

14

(i)    in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

(ii)    in a congressional, Government Accountability Office[ ("GAO")], or other Federal report, hearing, audit, or investigation; or

(iii)    from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B)    For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(A)–(B).  The inquiry involves two steps.  *See United States ex rel. Calva v. Impac Secured Assets Corp.*, No. SACV161983JVSJCGX, 2018 WL 6016152, at *3 (C.D. Cal. June 12, 2018).  "First, the Court must determine whether there was a prior 'public disclosure' of the allegations or transactions underlying the *qui tam* suit through one of the enumerated sources."  *Id.* (citing 31 U.S.C. § 3730(e)(4)(A) (1986 & 2010 versions)).  "If there has been a public disclosure, the Court must then determine whether the relator is an 'original source' within the meaning of the statute."  *Id.* (citing 31 U.S.C. § 3730(e)(4)(A) (1986 & 2010 versions)).  Here, Defendants challenge both whether Relator (1) alleges allegations or transactions that were publicly disclosed, and, if so, (2) is the original source of the information.  (*See* Defs.' Mem. at 30–35.)

As for the first prong, public disclosure requires that "three things are true: (1) the disclosure at issue occurred through one of the channels specified in the statute; (2) the disclosure was 'public'; and (3) the relator's action is 'based upon' the allegations or transactions publicly disclosed."  *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d

565, 570 (9th Cir. 2016) (quoting *Malhotra v. Steinberg*, 770 F.3d 853, 858 (9th Cir. 2014) (quoting 31 U.S.C. § 3730(e)(4)(A) (1986))); *Silbersher*, 506 F. Supp. 3d at 797 (quoting *United States ex rel. Solis v. Millennium Pharm., Inc.*, 885 F.3d 623, 626 (9th Cir. 2018)). Here, Defendants argue that GET's public website and publicly available filings with the California Secretary of State "publicly disclosed the allegedly true state of facts[,] that is, that GET's CEO was a man rather than a woman." (*See* Defs.' Mem. at 31–33.) According to Defendants, these sources, as "publicly-available filings" and "news media," are one of the channels specified by Section 3730(e)(4)(A). (*See* Defs.' Mem. at 31.)

The Court first examines Defendants' contention that their "publicly-available filings," presumably GET's filings with the California Secretary of State revealing that it had male CEOs during the entirety of the relevant period, "constitute an administrative report." (*See* Defs.' Mem. at 31.) Although the 1986 version of the public disclosure bar included "administrative . . . report[s]," *See* 31 U.S.C. § 3730(e)(4)(A) (1986), the 2010 version substituted "Federal" in its place. *See* 31 U.S.C. § 3730(e)(4)(A)(ii) (2010) ("The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation."). Defendants' filings with the California Secretary of State are not "congressional[;]" are not made with the GAO; and, unlike the filings with the Securities and Exchange Commission in *United States ex rel. Ryan v. Endo Pharmaceuticals, Inc.*, 27 F. Supp. 3d 615, 628 n.16 (E.D. Pa. 2014), are not "Federal." The Court therefore concludes that Defendants have failed to establish that their filings with the California Secretary of State were made publicly available through one of the enumerated sources specified in the 2010 version of the public-disclosure bar.

Defendants also contend that GET's website and filings with the California Secretary of State qualify as "news media" for purposes of the FCA's public-disclosure bar. (*See* Defs.' Mem. at 1; *see also* 31 U.S.C. § 3730(e)(4)(A)(iii).) Although there is little in-depth analysis of the scope of the term "news media" for the purposes of the statute,

the channels specified by the statute do "not capture all information that could be described as 'public' in common parlance." *See United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, No. CV 17-1694 PSG (SSX), 2019 WL 3282619, at *10 (C.D. Cal. July 16, 2019), *rev'd and remanded on different grounds*, 854 F. App'x 840 (9th Cir. 2021). "Instead, '[b]y its plain terms, the public disclosure bar applies to some methods of public disclosure and not to others.'" *Id.* (alteration in original) (quoting *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 414 (2011). Consequently, "applying the news media provision to anything ever published publicly on the internet is contrary to the ordinary meaning of the term 'news media' and has the potential to eviscerate the balance Congress struck between encouraging private parties to bring forth evidence of fraud and preventing parasitic suits." *See id.* at *12.

Accordingly, the Honorable Philip S. Gutierrez has proposed "several factors [that] provide useful guideposts in determining whether information from an online source has been disclosed 'from the news media' within the meaning of the FCA's public disclosure bar." *See id.* at *14. "*First*, . . . the extent to which the information typically conveyed by a source would be considered newsworthy is relevant to whether it is a news media source." *See id.* (emphasis in original). "*Second*, . . . a news media entity is ordinarily viewed as one that collects information from outside sources, exercises some editorial judgment in deciding what to publish, and then transmits the published information to an audience— put more simply, it curates information—in contrast to an entity that simply publishes information about itself." *See id.* (emphasis in original); *see also United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 36 ITRD 697 (E.D. Pa. 2014) ("This Court agrees that, at minimum, a publicly available website may qualify as 'news media' where the information provided is to some extent curated—that is, where the authors or editors of the website actively gather and disseminate information, provide search tools for the public to analyze data, provide some editorial content, or exercise some control over the information provided—and where the information bears at least some of the 'indicia of reliability or substantiation' common to more traditional news media sources."). "*Third*,

1  . . . a source's intent to disseminate information widely, as opposed to only to a few

2  individuals, is relevant to whether it is acting as a news media entity." *See Integra Med*

3  *Analytics*, 2019 WL 3282619, at *14 (emphasis in original).  "*Fourth*, . . . the more that an

4  online source functions like . . . traditional [news media] outlets, the more likely it is to be

5  news media under the FCA."  *See id.* at *15 (emphasis in original).  "Relevant to this

6  consideration is the extent to which the conveyance of newsworthy information is the

7  primary purpose of entity publishing the online source or whether the dissemination of

8  such information is merely ancillary to some other purpose."  *See id.*  "*Finally*, consistent

9  with the Supreme Court's approach in *Schindler Elevator*, . . . the most important

10  consideration is whether the source in question falls within the 'broad ordinary meaning'

11  of the term 'news media'—in other words, whether it could reasonably be described as

12  'news media' as at least some people would [use] that term in everyday speech."  *See id.*

13  (emphasis in original) (quoting *Schindler Elevator*, 363 U.S. at 408).

14      Applying those factors here, it is clear that neither GET's nor the California

15  Secretary of State's website qualifies as "news media" for purposes of the FCA's public-

16  disclosure bar.  As for GET's website, first, given GET's size, it appears unlikely that the

17  announcement of its CEO would be considered particularly newsworthy.  Second, GET's

18  website is not "curated," but rather "simply publishes information about itself."  *See id.* at

19  *14.  Third, while GET does intend to circulate information widely to potential business

20  partners, fourth, the conveyance of this information is "merely ancillary to" its primary

21  business of manufacturing and selling naval tactical data systems.  *See id.* at *15.  Finally,

22  and most importantly, GET's corporate website does not fall within the broad ordinary

23  meaning of the term "news media."  The same analysis would apply to GET's filings on

24  the California Secretary of State's website and GET's submissions through SAM.  The

25  Court therefore concludes that the sources Defendants identify as disclosing the allegedly

26  true state of facts are not "news media" as specified by the 2010 version of the FCA.

27      Because the Court concludes that none of the purported disclosures revealing the

28  allegedly "true" state of affairs—*i.e.*, that GET had male CEOs during the relevant

period—occurred through any channel specified by the 2010 version of the statute, Relator's FCA claims are not barred by the public-disclosure bar.  Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment as to that argument.

## II.   FCA Claims

### A.   *First and Second Causes of Action*

Relator alleges claims for presentation of false claims in violation of 31 U.S.C. § 3729(a)(1)(A), (*see* Compl. ¶¶ 90–94), and for making or using a false record or statement under 31 U.S.C. § 3729(a)(1)(B).  (*See* Compl. ¶¶ 95–100.)  The Parties agree that "the essential elements of False Claims Act liability . . . [are]: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006); *see also* Rel.'s Mem. at 24; Defs.' Mem. at 23–24.  Each Party contends that they are entitled to summary adjudication of these claims—or parts of them—in their favor.  (*Compare, e.g.*, Rel.'s Mem. at 26–38, *with, e.g.*, Defs.' Mem. at 23–27.)

As an initial matter, it is unclear whether Relator contends that Defendants misrepresented GET as a WOSB for purposes of obtaining orders, contracts, and sub-contracts as part of the WOSB Goal or under the WOSB Program.  (*See generally* Compl.)  The two programs are distinct, meaning the standards and evidence required to establish Defendants' liability (or not) differ.  For example, to the extent Relator's claims are premised on GET's alleged misrepresentation that it was a WOSB for purposes of the WOSB Program, Relator must prove that Defendants knowingly misrepresented GET as a WOSB to obtain payment from the government for an award for which GET was not eligible under the WOSB Program.  Defendants have introduced uncontroverted evidence that "GET has never . . . been awarded a contract under the WOSB Federal Contract Program."  (*See* ECF No. 102-4, Ex. C ("Adams Decl.") ¶ 3; *see also* ECF No. 107-1 ("Adams Opp'n Decl.") ¶¶ 3, 7.)  Accordingly, to the extent Relator's claims are premised on Defendants' alleged false statements or presentation of false claims to obtain payment

19

under the WOSB Program, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Relator's.

As for Relator's claims premised on Defendants' alleged misrepresentations of GET's WOSB status in connection with the WOSB Goal, Defendants have introduced uncontroverted evidence that certain contracts, subcontracts, and orders were awarded to GET because GET was the sole source for components of its proprietary systems. (*See, e.g.*, Adams Opp'n Decl. ¶¶ 6–8 & Ex. A (attesting to contracts for which GET was the sole available source).) Because no other entity—WOSB or not—could furnish these parts, (*see, e.g., id.*; ECF No. 102-4 Ex. B ("R. Tuttle Decl.") ¶¶ 4–5, 7–9, 12–16 (attesting that GET's products are not interchangeable with those of its competitors, meaning that GET is the only available source for customers who have installed their system)), Defendants' representation of GET as a WOSB could not "hav[e had] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" under a sole-source contract. *See* 31 U.S.C. § 3729(b)(4). Because there exist no disputes of fact that the purchases identified in Exhibit A to the Adams Opposition Declaration could only have been purchased from GET, the Court **GRANTS** Defendants' Motion for Summary Judgment as to those specific purchases and **DENIES** Relator's.

As for the remaining invoices identified by Relator, (*see generally* ECF No. 101-46 ("Ex. 45"); ECF Nos. 101-47–56 ("Ex. 46")), a number of critical material facts—and even the relevant law—remain subject to dispute, preventing the Court from granting summary adjudication in favor of either Party. For example, there is no evidence in the record as to which, if any, of the remaining underlying contracts, subcontracts, or orders (1) were with the government or a government contractor as opposed to a private party, (*see* ECF No. 107 ("Defs.' Opp'n") at 4; *cf.* Adams Decl. ¶ 4 & Ex. A (identifying 26 "direct Department of Defense contracts between 2011 and 2015" in which GET "Marked Woman Owned")); (2) involved representations regarding GET's claimed WOSB designation, (*see* Defs.' Opp'n at 6); and (3) were awarded to meet the WOSB Goal. (*See id.* at 5.) Accordingly, neither Party has demonstrated the absence of disputed facts as to whether or not

Defendants made false statements or presented false claims as to the remainder or these invoices.

There also appears to be a great deal of confusion as to which statutory and/or regulatory definition(s) of a WOSB controls here, both because there are several definitions and because the majority of those definitions have been amended during the course of the relevant conduct.[2]  For example, Defendants began representing GET as a WOSB under the FAR on August 9, 2009, (*see* Jt. Stmt. ¶ 15), after implementation of the WOSB Goal, *see* 15 U.S.C. § 644(g)(1)(A)(v) (1994), but before the SBA finalized its regulations promulgating the WOSB Program.  *See* 13 C.F.R. §§ 127.100–127.700 (2010).  Effective April 1, 2011, FAR began distinguishing between WOSBs generally and those "eligible under the WOSB Program (in accordance with 13 CFR part 127)."  *Compare, e.g.*, 48 C.F.R. §§ 2.101, 52.219-1, 52.212-3 (eff. July 1, 2009), *with, e.g.*, 48 C.F.R. §§ 2.101, 52.219-1, 52.212-3 (eff. Apr. 1, 2011).  This would seem to indicate that the WOSB Program regulations are inapplicable to WOSBs that are not competing in the WOSB Program.  Relator's falsity argument, however, relies heavily on the WOSB Program regulations, (*see generally* Rel.'s Mem. at 26–30), which impose additional requirements for control of a WOSB.  *See, e.g.*, 13 C.F.R. § 127.202(b) ("A woman . . . must hold the highest officer position in the concern . . . .").[3]  The Parties have identified—and the Court

---

[2] Indeed, it appears that even the SBA and contracting officers have had a great deal of difficulty in navigating the WOSB Program.  *See, e.g.*, Dilger, *supra*, at 18–19 & nn.62–70 (noting high rate of ineligibility of WOSB set-aside and sole-source contract awards through 2019, including a 2018 SBA Office of Inspector General ("OIG") audit finding that 50 of 56 audited contracts between January 1, 2016, and April 30, 2017, "were made 'without having the necessary documentation to determine eligibility' of the award recipients" (quoting SBA OIG, 18-18, Audit Report: SBA's Women-Owned Small Business Federal Contracting Program 4 (2018), https://www.sba.gov/document/report-18-18-sbas-women-owned-small-business-contracting-program)).

[3] For this reason, the Court is not persuaded by either the SBA's of the Navy's "determination" of GET's WOSB status.  The SBA eligibility examination related to GET's eligibility as a WOSB under the WOSB Program.  (*See, e.g.*, ECF No. 101-33 ("Ex. 2").)  Further, although the SBA had promised to "provide [GET] with a written eligibility determination," (*see id.*), the only "determination" available in the record is Defendant Adams' handwritten Post-It note dated December 9, 2015, indicating that Glynis Long

has found—no authority clarifying the correct standard to be applied here, and "differences in interpretation growing out of a disputed legal question are . . . not false under the FCA." *Thulin v. Shopko Stores Operating Co.*, No. 10-CV-196-WMC, 2013 WL 5946503, at *7 (W.D. Wis. Nov. 5, 2013) (alteration in original) (quoting *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (citing *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996))) (citing *United States v. Medica Rents Co.*, Nos. 03-11297 *et al.*, 2008 WL 3876307, at *3 (5th Cir. Aug. 19, 2008))), *aff'd*, 771 F.3d 994 (7th Cir. 2014).

Whatever standard applies, there exist genuine disputes of material fact as to GET's management structure and control and, consequently, the falsity of Defendants' designation of GET as a WOSB.  It is uncontroverted that men served as GET's CEO during the relevant period, (*see* Jt. Stmt. ¶¶ 9–10), but Defendants introduce evidence that GET's "management and daily business operations [we]re controlled by one or more women" during the relevant period.  *See* 48 C.F.R. § 2.101.  Specifically, Defendants introduce evidence that the CEO was subordinate to Guille Tuttle, (*see, e.g.*, ECF No. 102-4 Ex. A ("G. Tuttle Decl.") ¶¶ 15, 24–25 (attesting that Guille Tuttle "specifically chose to avoid being mentioned publicly as being the face of the company" but "created and defined a CEO position and established [her]self in the Ultimate Authority," to which the CEO was

---

informed Defendant Adams by phone that "because David Grundies is running the company as CEO she is changing our status in SAM, unchecking the box until status of that office changes."  (*See* ECF No. 101-2 ("Ex. 1").)  It is unclear from the record whether Long was unchecking the WOSB Program certification—which Defendants acknowledged at the hearing was erroneously selected—or GET's general WOSB certification for purposes of the WOSB Goal.  (*See, e.g.*, ECF No. 101-2 ("Ex. 22").)

The Navy determination, on the other hand, occurred well after the relevant time period.  (*See, e.g.*, ECF No. 101-42 ("Ex. 41") (show cause letter dated January 1, 2017).)  Further, like the SBA, the Navy appears to have been concerned with GET's representation as a WOSB under the WOSB Program regulations, 13 C.F.R. 127.  (*See* Ex. 41.)  Finally, Relator has provided no record of the Navy's determination except Defendants' admission that "the Department of Navy, Acquisition Integrity Office determined that GET was not a WOSB and notified Defendants of this determination on or around April 14, 2017."  (*See* ECF No. 101-17 ("Ex. 16") at 9, Request for Admission No. 25 and Response to Request for Admission No. 25.)  Accordingly, the Court cannot determine the scope of the Navy's final determination.

22

"subordinate")), and that several women, namely, Defendant Adams, Guille Tuttle, Sharon Bakun, and Cheri McCadam, ran GET during the relevant period.  (*See, e.g.*, *id.* ¶¶ 24–25 (attesting that Guille Tuttle made final decisions over policies, procedures, and contractual and operational commitments); Adams Decl. ¶ 2 (attesting that Adams served as "General Manager" and "was responsible for the day-to-day business and manufacturing operations" between 2003 and 2015); ECF No. 102-5 Ex. G ("Adams Depo.") at 12:20–13:13 (testifying that, during the relevant period, Adams served as General Manager, Bakun held the position of Head of Finance, and McCadam was Head of Production).)  Because the propriety of Defendants' representation of GET as a WOSB requires resolving factual issues (and credibility determinations), neither Party is entitled to summary adjudication in their favor as to falsity.

While these determinations justify denial of both Motions for Summary Judgment, Relator alternatively asks the Court to grant partial summary judgment in its favor as to certain elements of its FCA claims.  (*See* Rel.'s MSJ at 2–4.)  Specifically, Relator asks the Court to determine the following as a matter of law:

> (1)   From August 9, 2009[,] to December 10, 2015, Defendants represented that GET was a [WOSB];

> (2)   From August 9, 2009[,] to December 10, 2015, GET was not a WOSB because during that period men – not women – (a) led GET and managed its daily business operations on a full-time basis and (b) served in its highest officer position of CEO;

> (3)   From August 9, 2009[,] to December 10, 2015, GET represented that it was a WOSB in at least 1,022 invoices that it submitted to government and prime contractor customers in connection with a request for payment under a federal government prime contract or subcontract;

> (4)   GET's false representations were made knowingly, *see* 31 U.S.C. § 3729(b)(1), in that Defendants (a) had actual knowledge that GET was not a WOSB, (b) acted in deliberate ignorance of the truth or falsity of the representation that GET was a WOSB, and/or (c) acted in reckless disregard of the truth or falsity of the representation that GET was a WOSB;

/ / /

(5)     GET's false representations that it was a WOSB were material in that they had a material effect on the decisions of the federal government and prime contractors to make awards to GET and to make payments to GET pursuant to the contracts awarded to GET as a result of such representations;

(6)     under the Presumed Loss Rule, 13 C.F.R. § 121.108, the United States suffered damages of approximately $16,001,503.07 as a result of GET's false representations, reflecting the total value of the government contracts and subcontracts received by GET from 2009 through 2015, which is comprised of approximately $3,718,858 in government contracts and $12,282,645 in subcontracts under government contracts;

(7)     trebling the United States' damages of approximately $16,001,503.07 pursuant to 31 U.S.C. § 3729(a)(1) yields damages of more than $48 million to be awarded under the False Claims Act;

(8)     pursuant to 31 U.S.C. § 3729(a)(1), the minimum civil penalty to be awarded for each false document is currently $11,665, yielding total civil penalties of at least $11,921,630 based on the 1,022 invoices submitted by GET for payment; and

(9)     each Defendant is jointly and severally liable for the penalties and damages awarded for GET's false claims.

(*See id.*)

Regarding Relator's first request, the Parties do not dispute that, "[o]n or about August 9, 2009, GET represented to the U.S. Government and prime contractors that it was a WOSB, as defined by FAR 2.101," (Jt. Stmt. ¶ 17), or that "GET represented itself as a WOSB on its website from August 9, 2009[,] to December 10, 2015." (*Id.* ¶ 21.)  To the extent Relator seeks summary adjudication that GET represented itself as a WOSB in any other capacity between August 9, 2009, to December 10, 2015, however, the Court **DENIES** Relator's request (1).

As for Relator's second request, Defendants acknowledged at the hearing that GET did not qualify as a WOSB for purposes of the WOSB Program.  Nonetheless, because it is undisputed that GET did not obtain any awards under the WOSB Program, the Court has dismissed Relator's FCA causes of action to that extent.  The Court therefore **DENIES AS**

**MOOT** Relator's request (2) to the extent it is premised on GET's qualification as a WOSB under the WOSB Program.  As for the WOSB Goal, the Court has already determined that "there exist genuine disputes of material fact as to GET's management structure and control."  *See supra* page 22.  The Court therefore **DENIES** Relator's request (2)(a) to the extent it is premised on GET's eligibility as a WOSB for the WOSB Goal.  Although the Parties do not dispute that, "[s]tarting sometime in 1997, men served as GET's CEO until December 10, 2015," (Jt. Stmt. ¶ 9), or that, "[b]etween August 9, 2009[,] to December 10, 2015, a man held the officer position entitled CEO/President," (*id.* ¶ 10), the Court also **DENIES** request (2)(b) to the extent Relator seeks a determination that GET was not a WOSB for purposes of the WOSB Goal because it is not clear that the WOSB Program regulations, including 13 C.F.R. § 127.202(b), apply.  *See supra* pages 21–22.

Regarding Relator's third request, the Court already has granted summary judgment in Defendants' favor on several of the invoices identified by Relator.  *See supra* page 20; *see also* Adams Opp'n Decl. Ex. A.  As for the remaining invoices, the Court determined that "there is no evidence in the record as to which, if any, of the remaining [invoices] . . . involved representations regarding GET's claimed WOSB designation."  *See supra* page 20.  The Court therefore **DENIES** request (3).

As to Relator's fourth request, given material issues concerning the alleged falsity of Defendants' WOSB representations and the abject confusion regarding the relevant statutory and regulatory scheme, *see supra* pages 20–23 & nn.2–3; Defs.' Opp'n at 20 (contending that any misrepresentations "may stem from innocent mistakes in interpretation of the complex and frequently changing laws and regulations governing the WOSB Program and federal procurement"), the Court **DENIES** Relator's request (4).

Regarding Relator's fifth request, the Court already has granted summary judgment in favor of Defendants as to those orders for which GET was the sole source for its own proprietary components.  *See supra* page 20; *see also* Adams Opp'n Decl. Ex. A.  The Court therefore **DENIES** Relator's request (5).

/ / /

Relator's remaining requests pertain to damages.  Because Relator has failed to establish liability, determinations related to damages (and their calculation) are premature.  The Court therefore **DENIES** requests (6) through (9).

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment and **DENIES** Relator's Motion for Summary Judgment as to Relator's first and second causes of action.

### B.    *Third Cause of Action for Conspiracy*

Relator's third cause of action is for conspiracy to violate the FCA pursuant to 31 U.S.C. § 3729(a)(1)(C), (*see generally* Compl. ¶¶ 101–04), which makes liable "any person who . . . conspires to commit a violation of [the FCA]."  *See* 31 U.S.C. § 3729(a)(1)(C).  Relator contends that it is entitled to summary adjudication of this claim in its favor, (*see* Rel.'s Mem. at 38–39), while Defendants urge that the claim is barred by the intracorporate conspiracy doctrine.  (*See* Defs.' Mem. at 28.)

"The intracorporate conspiracy doctrine, derived from antitrust law, holds that a conspiracy requires 'an agreement among two or more persons or distinct business entities.'"  *United States ex rel. Lupo v. Quality Assurance Servs., Inc.*, 242 F. Supp. 3d 1020, 1027 (S.D. Cal. 2017) (quoting *United States v. Hughes Aircraft Co.*, 20 F.3d 974, 979 (9th Cir. 1994), *as amended* (Apr. 28, 1994)).  "The logic for the doctrine comes directly from the definition of a conspiracy."  *Id.* (quoting *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000)).  "It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy.  'A corporation cannot conspire with itself anymore than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.'"  *Id.* (quoting *Hoefer*, 92 F. Supp. 2d at 1057 (quoting *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir. 1952))).

"Though the Ninth Circuit has not spoken on the issue, a number of district courts, including those within the Ninth Circuit, have applied the intracorporate conspiracy doctrine to FCA claims."  *Id.* (collecting cases); *see also Hawaii ex rel. Torricer v. Liberty Dialysis-Haw. LLC*, 512 F. Supp. 3d 1096, 1118 (D. Haw. 2021); *United States ex rel.*

26

*Markus v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240, 1249 (E.D. Cal. 2019); *United States ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1037–38 (C.D. Cal. 2012).  Although Relator cites to a number of out-of-Circuit authorities to support its argument that the intracorporate conspiracy doctrine does not apply in the FCA context, (*see* Rel.'s Opp'n at 25–27), the Court finds persuasive the reasoning of "[t]he weight of existing case law authority" within this Circuit.  (*Cf id.* at 26.)  Accordingly, the Court concludes that it is appropriate to apply the intracorporate conspiracy doctrine here.

It is undisputed that Adams, Tuttle, MacNeil, and Grundies were acting as employees of GET during the relevant period, (*see* Jt. Stmt. ¶¶ 1, 4, 11, 13, 16, 22), and Relator introduces no facts showing that any of these Defendants conspired with any person or entity distinct from GET.  Accordingly, the Court concludes that Relator's third cause of action is barred by the intracorporate conspiracy doctrine and **DISMISSES** that claim.

### C.  *Statute of Limitations*

Finally, Defendants argue in their Opposition to Relator's Motion for Summary Judgment that Relator's claims under the FCA are barred by the statute of limitations.  (*See* Defs.' Opp'n at 29–31.)  The FCA sets the following statute of limitations:

> (b)   A civil action under section 3730 may not be brought—
>
> (1)   more than 6 years after the date on which the violation of section 3729 is committed, or
>
> (2)   more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,
>
> whichever occurs last.

31 U.S.C. § 3731(b).

Defendants contend that any violations occurring before February 16, 2012—six years before Relator filed its Complaint—are barred under 31 U.S.C. § 3731(b)(1).  (*See*

Defs.' Opp'n at 30.) Relator does not contest that some its claims would be untimely under Section 3731(b)(1); rather, it contends that the Section 3731(b)(2) applies to its FCA causes of action. (*See* ECF No. 110 ("Rel.'s Reply") at 13–15.)

As for Section 3731(b)(2), Defendants urge that Relator's claims are untimely under that provision because the contracting officers that verify the eligibility of contractors should have been aware of any alleged fraud at the time of awarding GET any contracts. (*See* Defs.' Opp'n at 30–31.) Relator, on the other hand, argues that its claims are timely because Relator did not provide its comprehensive disclosure to the SBA, Navy, and GSA until August 9, 2015. (*See* Rel.'s Reply at 14 (citing ECF No. 101-32 ("Ex. 31")).) In any event, Relator asserts, the relevant official is not the contracting officer, but rather somebody within the Department of Justice ("DOJ"), who was not notified in this case until May 2, 2016, at the earliest. (*See id.* at 14–15 (citing ECF No. 101-2 ("Ex. 1")).) The Court therefore must determine who "the official of the United States charged with responsibility to act in the circumstances" was and when that official "kn[ew] or reasonably should have been known" of Defendants' alleged fraud.

Unfortunately, there exists little guidance as to who the relevant official is for purposes of the FTCA's statute of limitations, and what little guidance there is has been inconsistent. *See, e.g.*, *LW Constr. of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 295 (2018) ("Other judges in various federal courts, for example, are divided on whether the 'official of the United States' refers specifically to an official within the Civil Division of the DOJ or to any government employee."); *see also, e.g.*, *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, --- U.S. ---, 139 S. Ct. 1507, 1514 (2019) (declining to determine "which official or officials the statute is referring to" but concluding that the phrase does exclude relators). Ultimately, the Court finds persuasive those cases concluding that the statute of limitations begins to run once the DOJ knew—or should have known—of the material facts. *See, e.g.*, *United States ex rel. Jordan v. Northrop Grumman Corp.*, No. CV 95-2985 ABC (EX), 2002 WL 35628747, at *4 (C.D. Cal. Aug. 5, 2002) ("Based upon the legislative history, the Court finds that the relevant official is one withing the

28

Department of Justice."); *United States ex rel. Condie v. Bd. of Regents of Univ. of Cal.*, No. C89-3550-FMS, 1993 WL 740185, at *2 (N.D. Cal. Sept. 7, 1993) ("[T]he Court follows the reasoning of *Island Park* and holds that the statute of limitations was tolled until the DOJ became aware, or should have become aware, of the false claims."); *United States v. Inc. Vill. of Island Park*, 791 F. Supp. 354, 363 (E.D.N.Y. 1992) ("[T]he limitations period was tolled until 'the facts material to the right of action [were] known or reasonably should have been known' by that DOJ official.").

Applying that standard here, Relator's claims are timely whether the Court determines that the DOJ reasonably should have known of Defendants' allegedly fraudulent claims after Relator made its disclosure to the Navy, SBA, and GSA on August 9, 2015, (*see generally* Ex. 31); after Relator met with officials from the Criminal Division of the United States Attorney's Office for the Southern District of California on May 2, 2016, (*see generally* ECF No. 110-2); or after Relator subsequently met with officials from the Civil Division of that office. (*See* Rel.'s Reply at 15 n.7.) The limitations period therefore did not run until August 9, 2018, at the earliest, which was over six months after Relator filed its Complaint on February 16, 2018. (*See generally* Compl.) Accordingly, the Court concludes that Relator's FCA claims are timely.

## CONCLUSION

In light of the foregoing, the Court **DENIES** Relator's Motion for Summary Judgment (ECF No. 101) and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 102). Specifically, the Court **GRANTS** Defendants' Motion for Summary Judgment as to (1) Relator's first and second causes of action to the extent those claims are premised on (a) Defendants' allegedly false statements or claims in connection with the WOSB Program, and (b) the orders identified in Exhibit A to the Adams Opposition Declaration (ECF No. 107-1 at 6–15 as numbered by CM/ECF); and (2) Relator's third and fourth causes of action in their entirety. Defendants' Motion for Summary Judgment is **DENIED** in all other respects. As Relator's request, the Court also **DISMISSES** Relator's fourth cause of action.

The Parties **SHALL FILE** a Joint Status Report within <u>seven (7) days</u> of the electronic docketing of this Order regarding the status of this litigation and proposing a joint schedule for pretrial dates and deadlines.

**IT IS SO ORDERED**.

Dated:  January 18, 2022

Honorable Todd W. Robinson
United States District Court

19-CV-1249 TWR (AGS)