1

2

3

4

5

6

7

8                  UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA *ex rel.*        Case No.: 19-cv-1249-RSH-MSB
     MC2 SABTECH HOLDINGS, INC.,
12   d/b/a "IXI TECHNOLOGY, INC.,"             **ORDER DENYING POST-TRIAL**
                                               **MOTIONS**
13                      Plaintiff/Relator,
14         v.                                  [ECF Nos. 250, 253]
15
16   GET ENGINEERING CORP. et al.,
17                         Defendants.
18

19         Pending before the Court are two post-trial motions: (1) Relator's motion for a new

20   trial [ECF No. 250], and (2) Defendants' motion for fees [ECF No. 253]. As set forth

21   below, the motions are denied.

22   **I.      BACKGROUND**

23         This case involves a dispute between two government contractors who are

24   competitors in supplying naval tactical data systems, computerized systems for use aboard

25   combat ships: Relator Sabtech Holdings, Inc., d/b/a IXI Technology, Inc. ("Relator") and

26   GET Engineering Corp. ("GET").

27

28                                        1

The crux of the lawsuit is Relator's allegation that between August 9, 2009, and December 10, 2015 (the "relevant period"), GET fraudulently misrepresented itself as a women-owned small business ("WOSB") in order to obtain government contracts. Throughout this period of time, the Federal Acquisition Regulation ("FAR") contained a definition of Women-Owned Small Business that included "a small business concern" "[t]hat is at least 51 percent owned by one or more women; or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women" and "[w]hose management and daily business operations are controlled by one or more women . . . ." 48 C.F.R. § 2.101 (relevant language contained in current and historical versions in effect during the yrelevant period). The first of these requirements relates to ownership; the second, to control.

There was no dispute that, during the relevant period of time, GET was in fact majority owned by Ms. Guille Tuttle, satisfying the first requirement. The minority owner was her husband, Mr. Rodney Tuttle, a defendant. However, during this period GET indisputably had only males holding the title of Chief Executive Officer – including two defendants, Mr. Greg MacNeil followed by Mr. David Grundies. Regulations issued by the Small Business Administration in effect during the period at issue provided that in order to satisfy the control requirement, a woman "must hold the highest officer position in the concern . . . ." 13 C.F.R. § 127.202 (relevant language contained in historical versions in effect Oct. 31, 2008 to Feb. 3, 2011, and Feb. 4, 2011 to May 29, 2023). Additionally, in the midst of the relevant period, the SBA issued further regulations, effective February 4, 2011, providing that "[t]he woman … who holds the highest officer position of the concern must manage it on a full-time basis and devote full-time to the business concern during the normal working hours of business concerns in the same or similar line of business." 13 C.F.R. § 127.202(c) (historical version effective Feb. 4, 2011 to May 29, 2023). The Parties disputed Ms. Tuttle's level of effective control of the company during the relevant period of time, Ms. Tuttle had been diagnosed with a chronic autoimmune disease, and during the

relevant period her condition placed significant demands on her.[1] During the relevant period, the general manager of GET was also a woman, Ms. Leslie Adams, who reported to the CEO.

At trial, Defendants argued among other things that any misrepresentations about GET's status as a WOSB were made without knowledge of their falsity, asserting that Defendants believed GET satisfied the requirements of the FAR as to woman-ownership of the company, and—between the roles filled by Ms. Tuttle as an actively-engaged owner and Ms. Adams as general manager—as to control by women. The Parties also disputed whether GET's self-representation as a WOSB was material to any contracting decision by the U.S. Navy. Relator argued that GET made the misrepresentation for the purpose of securing contracts, allowing government agencies and prime contractors to meet their contracting goals by reporting that, in doing business with GET, they had contracted with a WOSB. Defendants argued that, on the contrary, customers chose GET because of the quality of its niche products.

The following section, in summarizing the procedural history of this lawsuit that was filed almost seven years ago, focuses on those aspects of the docket and trial that are most relevant to the numerous issues raised in the pending post-trial motions.

## A. Pleadings and Summary Judgment Motions

On February 16, 2018, Relator filed this qui tam action under the False Claims Act against GET and five of its current or former officers or directors. ECF No. 1. Relator filed the lawsuit in the U.S. District Court for the Central District of California. *Id.* The United States declined to intervene, and on February 28, 2019, the Complaint was unsealed. ECF No. 13. On June 20, 2019, on Defendants' motion, the case was transferred to the U.S. District Court for the Southern District of California. ECF No. 42.

---

[1]    Ms. Tuttle, initially named as one of the defendants in the case, passed away during the lawsuit.

On January 18, 2022, the Court granted in part a motion for summary judgment filed by Defendants, and denied a motion for summary judgment that had been filed by Relator. ECF No. 115. Relator thereafter moved for reconsideration of that order. ECF No. 123.

On June 24, 2022, the case was transferred to the undersigned. ECF No. 132. On December 22, 2022, the Court granted in part and denied in part Relator's motion for reconsideration. ECF No. 133. Relator thereafter moved to dismiss two of the five individual defendants, ECF No. 157, which the Court granted, ECF No. 163, leaving the four defendants who went to trial: GET, Mr. Tuttle, Mr. MacNeil, and Mr. Grundies.

## B.    Pretrial Conference

After granting several requests by the Parties to continue the pretrial dates, the Court scheduled a pretrial conference for May 23, 2024. ECF No. 177. In advance of that hearing, the Parties submitted a proposed pretrial order, ECF No. 180-1, which the Court rejected in a written order as non-compliant. ECF No. 184. The Parties thereafter submitted a second proposed pretrial order. ECF No. 185.

At the pretrial conference, the Court addressed persisting deficiencies in the second proposed pretrial order, and directed the Parties to submit a third version.  ECF No. 180. The Court also heard argument from the Parties on Relator's request for a jury instruction on the "presumed loss rule"—as discussed further below, an instruction that would allow the jury in certain circumstances to presume a loss amount where Defendants were found liable—and deferred ruling on the instruction. *See* ECF Nos. 185 (Parties' proposed jury instructions), 186 (minute order directing argument on the instruction); 189 (Defendants' objections to Relator's proposed instruction). The Court also heard argument on Defendants' objections to untimely disclosure of Relators' witnesses and evidence in Relator's pretrial disclosures, and set a schedule for further briefing. *See* ECF Nos. 142 (Relator's pretrial disclosures under Rule 26(a)(3)); 143 (Defendants' objections to Relator's pretrial disclosures); 166 (Relator's amened pretrial disclosures); 190 (briefing schedule set a pretrial conference). The Court scheduled a trial date and date for hearing in

4

limine motions. ECF No. 190. The Court also imposed, with the agreement of the Parties, a time limit for presentation of evidence, and for opening and closing, of 17 hours per side. ECF No. 217 (Tr. of May 23, 2024) at 49:8-50:22.

The Parties thereafter submitted a third proposed pretrial order. ECF No. 197-1. On July 15, 2024, with some modifications to the third proposed order, the Court entered its Pretrial Order. ECF No. 208. As reflected in the Pretrial Order, Relator was proceeding to trial on two causes of action under the False Claims Act—presentation of false claims in violation of 31 U.S.C. § 3729(a)(1)(A), and making or using a false record in violation of 31 U.S.C. § 3729(a)(1)(B)—against each of the four defendants. ECF No. 208 at 2-5.

As directed, the Parties also filed supplemental briefs on Defendants' objections to Relator's pretrial disclosures. ECF Nos. 193, 198. On July 10, 2024, the Court entered an order sustaining those objections in part. ECF No. 207. Defendants had objected to 69 of the witnesses in Relator's Rule 26(a)(3) disclosures on the grounds that they had not been identified in Relator's initial disclosures, discovery responses, or supplemental disclosures, and had not been deposed. *Id.* at 11. In response, Relator withdrew 57 of its disputed witnesses, and added one new witness; accordingly, the Court's order addressed outstanding objections as to 13 of Relator's witnesses. *Id.* at 12. Of those 13, the Court precluded Relator from calling 10 of those witnesses "at trial in its case-in-chief," declined to preclude two other witnesses, and ruled that one witness would be permitted to provide certain limited testimony in Relator's case-in-chief. *Id.* The Court's Order did not purport to preclude any witnesses from testifying in Relator's rebuttal case. The two witnesses that the Court *declined* to preclude had been U.S. Navy officials who participated in a meeting with GET in April 2017, Catherine Kessmeier and Philip Hadji, discussed further below. *Id.* at 18-20. The Court determined that although Relator could and should have disclosed these witnesses earlier, the failure to disclose was harmless. *Id.* Relator thereafter moved for reconsideration, or in the alternative, for "clarification" that Relator could still call

1  otherwise precluded witnesses during its case-in-chief if they were "impeachment"

2  witnesses. ECF No. 215.

3  **C.  Motions in Limine**

4  On August 1, 2024, the Court heard motions in limine. ECF No. 218. Among

5  Relator's motions was a motion to admit in its entirety an audio recording of a meeting on

6  April 17, 2017 between representatives of GET and U.S. Navy officials. *See* ECF Nos. 195

7  (Relator's motion), 210 (Defendants' opposition). The meeting occurred approximately

8  one-and-a-half years after the end of the relevant period (December 10, 2015). Relator

9  argued that the statements made by GET representatives during this interview were

10 relevant non-hearsay admissions by a party opponent. ECF No. 195 at 5-7. As to the

11 statements made during by the Navy officials, Relator argued that they fell within the

12 hearsay exceptions for "business records" or "public records," or alternatively, that those

13 statements "are offered for non-hearsay purposes, as they go to their effect on the hearer—

14 GET's attending representatives and co-owner—and provide context for their responses as

15 well as tacit admissions in the face of the [Navy's] questions." *Id.* at 7. The transcript of

16 the recording was approximately 47 pages, ECF No. 195-2, and Relator's motion did not

17 identify particular lines or portions that Relator sought to admit.

18 At the motion in limine hearing, the Court ruled that all statements by GET's

19 representatives were admissible, as well as the questions posed by Navy representatives;

20 but denied the admission of affirmative statements made by the Navy officials on grounds

21 of hearsay and Rule 403. *See* ECF No. 250-3 (Canni Decl. Ex. A, Rough Tr. of Motion in

22 Limine Hearing) at 41:12-45:25.[2] The Court explained:

23

24 ───────────────────

25 [2]  Relator litigated this case vigorously over a period of seven years, but chose not to

26 order official transcripts of the trial or of the in limine hearing to support Relator's post-

27 trial motion. Instead, Relator attaches to its motion, as exhibits, rough drafts of transcripts

28 that Relator had previously ordered contemporaneously. The Court cites these same

> So for the most part, I'm going to allow the questions in order to make the context and responses intelligible; however, I'm going to exclude as hearsay and under Rules 402 and 403 those statements of the Navy that are in fact statements of opinion and, in some cases, accusations.
>
> So a simple question, that's allowed in; the answer is allowed in; but the Navy pointing the finger and saying, "You might go to jail for this," the Navy making accusations, that's not coming in. That's hearsay. That's being kept out under 403.

*Id.* at 42:21-43:5. The Court specified at the hearing by page and line number the specific portions that the Court was not admitting. *Id.* at 43:7-45:25.

Also at the in limine hearing, the Court denied Relator's motion to reconsider its order excluding witnesses from Relator's case-in-chief. ECF No. 218 (minutes of Aug. 1, 2024 hearing). The Court faulted Relator for filing its reconsideration motion on a last-minute emergency basis without adequate cause; for failing to address the analysis in the Court's previous order; and for failing to provide sufficient specificity with regard to the evidence offered. The Court also noted that the scale of Relator's failure to disclose— although Relator listed 78 witnesses in its Rule 26(a)(3) disclosures, its final witness list (after witnesses were withdrawn or excluded) consisted of only 12 witnesses—suggested bad faith and that Relator had sought to force Defendants to prepare to examine a large number of witnesses Relator never intended to call. As to Relator's motion to "clarify" that witnesses excluded from Relator's case-in-chief could nonetheless testify in that case-in-chief as "impeachment" witnesses, the Court directed Relator to address with the Court, outside the presence of the jury, the expected testimony of any such witness as well as what precisely it was intended to "impeach."

---

exhibits where applicable, but warns that they are not official transcripts and that Relator will be expected to file official transcripts in support of his pending appeal.

In advance of trial, Defendants submitted an alternative proposed instruction on the "presumed loss rule," ECF No. 219, and consistent with a request made by the Parties for a tentative ruling, the Court issued a tentative jury instruction on the presumed loss rule, ECF No. 220. The Court's tentative ruling stated, "At the instructions conference during the course of trial, the Parties should be prepared to raise any objections to this tentative instruction, and should also be prepared to address whether the evidence at trial warrants the giving of such instruction." ECF No. 220 at 1-2.

### D. Voir Dire

The jury trial began with voir dire on the morning on Monday, October 28, 2024. ECF No. 226. During voir dire, in response to questioning by the Court, one of the panel members—Prospective Juror No. 1—stated that she believed her husband played golf with Defendants' attorney Mr. Pate. The following exchange ensued:

> [THE COURT]: You believe your husband plays golf with Mr. Pate.
>
> PROSPECTIVE JUROR NO. 1: Yes. I don't know – I don't know if we've met, but I know the name.
>
> THE COURT: All right. And is there anything about your knowledge of your husband's golfing outings with Mr. Pate that cause you to form an opinion one way or the other about his work or his clients?
>
> PROSPECTIVE JUROR NO. 1: No.

ECF No. 250-4 (Canni Decl. Ex. B, Rough Tr. of Oct. 25, 2024) at 31:12-20. Relator's counsel then questioned the prospective juror:

> [MR. CANNI]: I wanted to know, Mr. Bill Pate, does he have a good golf game as you understand it?
>
> PROSPECTIVE JUROR NO. 1: As far as I know.
>
> MR. CANNI: Do you know what he shoots? Do you know what his shooting score is?

8

19-cv-1249-RSH-MSB

PROSPECTIVE JUROR NO. 1: No. My husband talks about it.

MR. CANNI: Do you think based on the fact that your husband and he are golf associates that you can render a verdict against his clients?

PROSPECTIVE JUROR NO. 1: Yes. Yes. I mean, it's uncomfortable for me. I'm going to be honest.

*Id.* at 60:17-61:3. The Court later returned to the same panel member:

[THE COURT]: [Prospective Juror No. 1], so you had answered some questions about your husband playing golf with Mr. Pate and you mentioned you were being candid, that you might have some discomfort in being part of a jury that reaches a verdict that requires Mr. Pate's clients to have to pay money. Again, recognizing we all have our opinions, we all have things that might make us more or less comfortable, if you were selected as a juror, you could put aside the fact that your husband plays golf with Mr. Pate?

PROSPECTIVE JUROR NO. 1: Of course. Of course.

THE COURT: You could be 100% fair to both sides. [Would] that be fair to say?

PROSPECTIVE JUROR NO. 1: Yes, yes, I could. We just live in a small community and I don't know. I just think it Bureau of Prisons [sic] that part of my life into the courtroom and like I said it makes me uncomfortable. It's just a different feeling for me, but I could be impartial.

THE COURT: If you were sitting in the relator's positions, the person bringing lawsuit, you would have concern besides your ability to be fair or do you think you could be 100% fair to both sides?

PROSPECTIVE JUROR NO. 1: Yes, I could. I could.

THE COURT: Thank you.

*Id.* at 71:17-72:14.

Outside the presence of the jury, Relator challenged the prospective juror for cause. *Id.* at 76:15-22. Defense counsel advised that he "had probably golfed with him more than a dozen times," *id.* at 77:15-16, but also said that they had not socialized outside the golf course. *Id.* at 77:6-10. The Court denied the challenge for cause, noting, "when I went back at the end she said seemed by her demeanor and the speed by with which she answered to be somewhat firmly convinced and comfortable be able to put aside whatever social discomfort she might have in order to try this case on its facts." *Id.* at 77:23-78:2. Relator later exercised a preemptory challenge on this prospective juror.

After the exercise of remaining challenges for cause followed by peremptory challenges, and still outside the presence of the jury, the Court inquired whether there were any challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986), or *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). ECF No. 250-4 (Canni Decl. Ex. B, Rough Tr. of Oct. 28, 2024) at 85:13-19. Relator's counsel told the Court, "I'll leave this to you. The only thing we note is that all three men [stricken by Defendants] fit the same demographic of three Hispanic men. Other than that – and I don't know if that's a cause for concern, but I just wanted to share the observation we had." *Id.* at 84:24-85:3. The Court asked counsel for clarification of whether Relator was posing a challenge or not. *Id.* at 85:4-6. Relator responded, "You Honor, we're challenging it. I'm putting it for you to decide with all your years of experience. It just caught us by surprise that all three men fit the same demographic." *Id.* at 85:7-10. The Court gave Relator the opportunity to argue further, and Relator stated, "Your Honor, you've heard the extent of it. It's based purely on meeting the three gentlemen." *Id.* at 85:15-16. Given the chance to respond, Defendants offered race-, ethnicity-, and gender-neutral explanations for their exercise of peremptory challenges. *Id.* at 85:19-86:19.

The first of the three challenged jurors was Prospective Juror 4, who worked for U.S. Customs and Border Protection. In response to the Court's questioning whether anyone suffered from a medical condition that would make it difficult to serve as a juror, he stated

that he is a disabled veteran who takes a lot of medication for his back and for his sciatica and some antidepressants, and that he was not sure whether that medication would affect his work as a juror. He also reported that the side effects from the medication he takes concern him, because they makes him drowsy. Defendants cited these medical problems, and the prospective juror's professional background, as the reasons for exercising their peremptory challenge. *Id.* at 85:20-23.

The second of the three challenged jurors was Prospective Juror 9, who worked as a custodian for a school district, was separated from his wife, and lived in Escondido, a city approximately 30 miles from downtown San Diego. Defendants cited as the reasons for their peremptory challenge the logistics of the prospective juror's commute, the separation, and his occupation, explaining that work as a custodian "isn't the type of background in terms of vocational background or education that we were looking for in this case." *Id.* at 86:4-10.

The third of the three challenged jurors was Prospective Juror 11. He stated that he had served in the U.S. Marine Corps, and that his job gave him a very thorough knowledge of how the contracting and procurement process worked. In response to questioning by the Court, he stated that some of the equipment he had seen delivered by contractors was "pretty much horrible" and said that he didn't think he could "put that aside" in serving as a juror. Later, on being questioned by Relator's counsel, he stated that if the case did not involve allegations of faulty equipment, he believed he could hear the case. Defendants had challenged this prospective juror for cause, which the Court overruled. *Id.* at 81:15-82:5.

The Court found that Relator had made a prima facie case of discrimination but accepted Defendants' proffered reasons and overruled the challenge. *Id.* at 86:21-88:2.

### E.    Rebuttal and Sur-Rebuttal

At the end of the fourth day of trial on Thursday, October 31, 2024, after the Court had dismissed the jury for the weekend and with Relator's case-in-chief was still pending,

Relator advised the Court of its intent to call Mr. John Klein, Associate General Counsel for the Small Business Administration ("SBA"), as a rebuttal witness the following week.[3] Defendants objected, including based on lack of personal knowledge and improper expert opinion. The Court asked Relator to respond to the objections, to clarify what testimony Mr. Klein would be providing, and to explain what his testimony was rebutting. Relator articulated several general areas of testimony; but as the discussion proceeded the Court characterized that proffer as a "moving target." The Court directed Relator to put the categories of proffered testimony in writing, and told the Parties to meet and confer over any objections, and to file briefing on any unresolved issues by midnight on Saturday.

That Saturday, the Parties filed competing briefs reflecting that no agreement had been reached. ECF Nos. 234, 235. Relator's brief set forth six areas of expected testimony, and also disclosed that Mr. Klein would only be available on the following Tuesday, when Defendants might still be in the midst of their own case-in-chief. ECF No. 235.

On the morning of Monday, November 4, 2024, at the outset of the fifth day of trial, the Court addressed the weekend filings and provided tentative rulings on each of the six areas of proffered testimony, to be revisited if Mr. Klein were actually available to testify in Relator's rebuttal case.

Relator concluded its case-in-chief on Monday afternoon.[4] The following day, Tuesday, November 5, 2024, Defendants rested their case. Relator then called Mr. Klein in its rebuttal case. The Court advised counsel that it would rule contemporaneously on any objections made in the course of Mr. Klein's testimony. Thus, at the time Mr. Klein took the witness stand, the Court had not made final rulings admitting or precluding his rebuttal

---

[3]    Mr. Klein was one of the witnesses excluded from Relator's case-in-chief by the Court's prior order, based on Relator's untimely disclosure. ECF No. 207.

[4]    Relator did not call in its case-in-chief either of the two U.S. Navy officials—Catherine Kessmeier or Philip Hadji—who participated in the April 17, 2017 meeting with GET that was the subject of Relator's in limine motion discussed above.

testimony; informed by the previous filings and argument, the Court was prepared to rule on objections as they were made. The testimony that Relator elicited from Mr. Klein included the following: (1) Mr. Klein reviewed GET's certifications, and observed that GET represented in those certifications that it was a WOSB; (2) the SBA, for which Mr. Klein works, is the agency responsible for determining whether a company is eligible for WOSB set-aside contracts; (3) the SBA is also responsible for determining whether a particular contract counts toward an agency's WOSB contracting goals; and (4) credit for WOSB contracting goals is not limited to contracts for particular types of goods and services. The import of this testimony was that, whether or not GET applied for any contracts that were actually set-aside for WOSBs, GET's self-representation as a WOSB was material because any agency that contracted with GET could use GET's WOSB status to help meet the agency's annual WOSB contracting goals. The Court did not sustain any objections to Mr. Klein's testimony, or otherwise limit the information that Relator elicited from Mr. Klein.

Mr. Klein was the only rebuttal witness that Relator chose to call. Relator chose not to call even a single GET customer—either from the government or from a prime contractor—to testify that the customer relied on, was influenced by, or otherwise believed to be material GET's self-representation as a WOSB.

Defendants then sought to call a sur-rebuttal witness, Mr. Larry Yarham, a former employee of GET customer Northrop Grumman. Defendants had previously provided notice of their intent to call such a witness in a sur-rebuttal case if Mr. Klein were permitted to testify.[5] Relator objected to the proposed testimony, contending that it was not proper

---

[5]    In their filing opposing Mr. Klein's testimony, Defendants had argued that if the Court permitted testimony by Mr. Klein, "Defendants should be allowed to call a witness from a prime contractor in Surrebuttal," explaining, "a prime contractor who worked for many years with GET … can explain the unique nature of the products, their quality, and

sur-rebuttal to Mr. Klein's testimony. The Court disagreed, on the grounds that both Mr. Klein's rebuttal testimony and Mr. Yarham's proposed sur-rebuttal testimony were directed to the Parties' respective theories of materiality. Mr. Yarham testified that: (1) he previously worked for prime contractor Northrop Grumman on naval tactical data systems, and relied on subcontractors to furnish the relevant parts; (2) after encountering problems with NTDS boards, he engaged Mr. MacNeil's company to provide new boards; (3) Mr. MacNeil's company provided a product that solved the problem; (4) Northrop Grumman thereafter continued to do business with Mr. MacNeil's company, because they furnished a good product; and (5) Mr. Yarham was the decisionmaker in contracting with Mr. MacNeil's company, and GET being a WOSB had nothing to do with that decision.

## F. Jury Instructions Conference and Verdict

On the afternoon of Day 6 of trial, Tuesday, November 5, 2024, the Court held the final instructions conference. Among the instructions discussed was Relator's requested instruction on the "presumed loss rule." That rule, codified at 13 C.F.R. § 127.700, provides:

> a) Presumption of Loss Based on the Total Amount Expended. In every contract, subcontract, cooperative agreement, cooperative research and development agreement, or grant which is set aside, reserved, or otherwise classified as intended for award to … WOSBs, there shall be a presumption of loss to the United States based on the total amount expended on the contract, subcontract, cooperative agreement, cooperative research and development agreement, or grant whenever it is established that a business concern other than a … WOSB willfully sought and received the award by misrepresentation.

By the express terms of that rule, one of the conditions for the application of the rule is a contract or agreement "which is set aside, reserved, or otherwise classified as intended for

_____

the reason why his company chose GET products over others. The decision had nothing to do with WOSB. This goes to the heart of materiality and reliance." ECF No. 234 at 7-8.

award to … WOSBs." There was no evidence offered at trial that GET was awarded a contract that was "set aside" or "reserved" for WOSBs; the issue at the instructions conference was whether there had been sufficient evidence of a contract that was "otherwise classified as intended for award" to WOSBs. In addressing this question, the Court stated:

> I've crafted a proposed instruction on the presumed loss rule, but I'm not going to hand it out at this moment because the threshold question is the question that I think we all have foreseen we would be discussing at this time, and this is: Has there been sufficient … factual matter in this trial that would allow a jury instruction to be given?
>
> So looking at the language of the readings 13 C.F.R. § 127.700, it refers to a contract or subcontract which is set-aside, reserved, or otherwise classified as intended for award to women-owned small businesses. And so I'm going to ask Mr. Canni and the Relator's team to help identify the evidence in the record that there are contracts or subcontractors here that fall into those categories. I believe we're not looking at contracts that are set-asides. I think that's been made clear throughout the trial many times over. Contracts which are reserved or otherwise classified as intended for award to women-owned small businesses. I don't know that we've had any evidence of that, but of course I'll hear from the Relator on that.

ECF No. 250-9 (Canni Decl. Ex. G, Rough Tr. of Nov. 5, 2024) at 115:13-116:7. Relator then argued that any contract awarded to GET, in which a box had been checked indicating that the contractor was a "WOSB," counted a "contract classified as intended for award." *Id.* at 116:10-117:5. The Court declined to give the requested instruction. There was no indication that any contract had, in advance of being awarded to GET, been classified as intended for award to a WOSB. The Court explained, "the fact that a contract is awarded and that the Government customer indicates that the contractor is a women-owned small business is simply not the same as that contract being classified as intended for award to a women-owned small business." *Id.* at 120:14-18.

The instructions conference also included a discussion of materiality. The Court's instructions defined materiality as follows: "'Material' means having a natural tendency to influence, or being capable of influencing, the payment or receipt of money or property." ECF No. 240 at p. 13. This definition followed the definition contained in the False Claims Act, 31 U.S.C. § 3729(b)(4) ("[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.").

Relator's proposed instruction included the following language:

> If a false statement has a natural tendency to influence or is capable of influencing a decision to enter into a contract or subcontract, that false statement is material.

> Materiality also can be demonstrated by the actions of the Government or Prime Contractors in several ways, including reliance on the false statement (a) to comply with congressionally mandated contracting goals, (b) to satisfy material contract terms such as terms requiring small business subcontracting plans, (c) to bring administrative or criminal enforcement actions or (d) where the contractor is on notice that the particular false statement may subject the contractor to penalties.

ECF No. 197 (Relator's Proposed Instruction No. 49) at 67. The first paragraph followed the language of the statute and was consistent with the instruction the Court gave. The second paragraph, which the Court did not give, was drafted by Relator and does not appear to come verbatim from any case or pattern jury instruction. Instead, Relator cited approximately two pages of cases that, Relator urged, supported the proposed instruction. *Id.* at 67-69. Defendants had objected before trial that Relator's proposed language went beyond the statutory definition and misstated the law, *id.* at 69, and raised the same objections at the instructions conference, ECF No. 250-9 (Canni Decl. Ex. G, Rough Tr. of Nov. 5, 2024) at 132:8-11. The Court declined to give the requested instruction. *Id.* at 131:11-132:13.

In total, the presentation of evidence and argument spanned seven court days. On the morning of the eighth day of trial, November 7, 2024, the jury returned a verdict in favor of all Defendants. ECF No. 241 (minutes of Day 8), 244 (verdict). The Court thereafter set a briefing schedule for post-trial motions. ECF No. 241.

### G.    Post-Trial Motions

On December 6, 2024, Relator timely filed its motion for a new trial. ECF No. 250. That motion has been fully briefed. ECF Nos. 257 (opposition), 260 (reply). On December 12, 2024, Defendants filed their motion for fees, which has also been fully briefed. ECF Nos. 253 (motion), 258 (opposition), 259 (reply).

## II.    RELATOR'S MOTION FOR A NEW TRIAL

Relator's motion is based, first, on asserted error in the following rulings: (1) the Court's in limine ruling excluding portions of the recording of the April 17, 2017 meeting between GET and Navy officials; (2) the Court's pretrial ruling excluding certain witnesses who had not been disclosed in discovery; (3) the Court's ruling during trial permitting Defendants to call a sur-rebuttal witness, Larry Yarham; (4) the Court's purported limitation of the rebuttal testimony of Relator's witness John Klein; (5) the Court's "err[or] in allowing Defendants to present evidence and argument to the jury that WOSB representations are only material in the set-aside context, for certain NAICS codes designed for set-asides or for service contracts only," ECF No. 250-1 at 11; (6) the Court's overruling of Relator's *Batson* challenge during jury selection; (7) the Court's refusing to excuse for cause a juror whose spouse had played golf with Defendant's counsel; (8) the Court's exclusion of purported summary evidence offered by Relator pursuant to Fed. R. Evid. 1006; (9) the Court's exclusion of Relator's anonymous letter leveling accusations against Defendants; (10) the Court's "erroneously permit[ing], over objection, cumulative and irrelevant testimony and argument concerning GET's revenues, allowing Defendants to improperly misdirect the jury regarding the relevance of GET's financial status and suggest its impending doom if the jury ruled against Defendants," ECF No. 250-1 at 17; (11) the

Court's rulings permitting reference to Plaintiff's prior owner; (12) the Court's rulings permitting reference to GET's prior owner, who was sued as a defendant but passed away during the lawsuit; and (13) the Court permitting references that Defendants' counsel made to Relator and its counsel as "bullies." *Id.* at 20.

Second, Relator argues that the Court gave the jury two erroneous instructions, on (1) materiality and (2) the presumed loss rule.

Third, Relator argues that the verdict was against the clear weight of the evidence.

### A.    Legal Standard

Under Rule 59, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59. "Such reasons may include a 'verdict [that] is contrary to the clear weight of the evidence,' a verdict 'based upon false or perjurious evidence,' or 'to prevent a miscarriage of justice.'" *Crowley v. Epicept Corp.*, 883 F.3d 739, 751 (9th Cir. 2018) (quoting *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). If a motion for new trial is based upon an alleged evidentiary error, a new trial is warranted only if the party was "substantially prejudiced" by an erroneous admission of the evidence. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).

"[T]he authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Dees v. Cnty. of San Diego*, 960 F.3d 1145, 1151 (9th Cir. 2020) (quoting *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)). "[T]he district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix LLC v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014); *accord Morris v. W. Hayden Ests. First Addition Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1152 (9th Cir. 2024).

"[J]ury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." *Gantt v. City of Los Angeles*, 717 F.3d 702, 706 (9th Cir. 2013) (quoting *White v. Ford Motor Co.*, 312 F.3d 998, 1012 (9th Cir. 2002)). "A party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). However, a court is "not required to ... incorporate every proposition of law suggested by counsel" so long as the "instructions as given allow[ ] the jury to determine intelligently the issues presented." *Los Angeles Memorial Coliseum Comm'n v. Nat. Football League*, 726 F.2d 1381, 1398 (9th Cir. 1984). Additionally, "if what is proposed is incorrect the court is not required to recast it in order to ensure the party's exact theory is before the jury, so long as the instructions describe the applicable law." *Id.* An error in instructing the jury is not a cause for new trial if it is "more probably than not harmless." *Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1337 (9th Cir. 1985).

## B.    Analysis

### 1.    Court rulings on evidence and argument

The Court addresses in turn Relator's various claims of error relating to evidence and argument.

*First*, Relator argues that the Court erred in its in limine ruling excluding portions of the April 17, 2017 meeting between GET and Navy officials. ECF No. 250-1 at 8-9. As discussed above, the Court ruled that GET's statements and the Navy's questions were admissible, but denied admission of other statements made by Navy officials during that meeting, on the basis of hearsay and Rule 403. Relator's post-trial motion does not identify, even by way of example, any particular statements by the Navy that Relator claims were admissible; and Relator's post-trial motion does not address either basis that the Court gave for exclusion. Relator's post-trial motion also argues a theory of relevance that Relator

waived by not making its in limine motion.[6] The Court concludes that there was no error in the previous ruling.

Additionally, Relator has failed to demonstrate prejudice. To the extent Relator wanted to offer evidence of the views of the Navy officials who were present in the meeting, it could have called those officials as witnesses in its case-in-chief; those officials were on Relator's witness list as set forth in the Court's Pretrial Order, ECF No. 208 at 7, and had not been excluded or limited by the Court. Offering testimony from these individuals would have overcome the hearsay issue, and the questions could have been created to avoid prejudice or confusion. Relator's failure to call them is unexplained.

*Second*, Relator objects to the Court's order of July 10, 2024 [ECF No. 207] excluding certain witnesses who had not been disclosed in discovery. ECF No. 250-1 at 9-10. Relator's post-trial motion again simply ignores the legal basis for the Court's ruling. Additionally, the course of events at trial reflects that Relator was not in fact prejudiced by the exclusion of any of those witnesses. By the terms of the Court's order, those witnesses were only excluded from Relator's case-in-chief, not from any rebuttal case that Relator might present. Yet of all those excluded witnesses, whom Relator describes as "critical" in its post-trial briefing, Relator only chose to call a single witness (SBA attorney John Klein) in its rebuttal case. As discussed above, Mr. Klein testified on rebuttal without any

---

[6] As discussed in the background section above, Relator's in limine motion argued that the statements by the Navy were relevant "as they go to their effect on the hearer – GET's attending representatives and co-owner – and provide context for their responses as well as tacit admissions in the face of the [Navy's] questions." ECF No. 195 at 7. Relator advanced the same theory during argument on the motions in limine. In contrast, Relator's post-trial motion instead argues that the Navy's statements were relevant to show that GET's misrepresentations were material. ECF No. 250-1 at 8 ("[T]he Court excluded **direct** evidence showing how seriously the Navy took GET's false representations when such evidence of government enforcement action is **directly** relevant to materiality, one of the key elements of Relator's False Claims Act claims.").

limitation imposed by the Court, and the Court in fact overruled every objection made by Defendants during Mr. Klein's testimony. The fact that Relator only called in its rebuttal case one of the numerous excluded witnesses appears to confirm the Court's suspicion, expressed at the hearing denying Relator's motion for reconsideration, that Relator never intended to call the vast majority of these witnesses who were not timely disclosed—but instead used them to pad its witness list, obscure its actual trial strategy, and cause Defendants to undertake unnecessary work in preparing to examine them.[7]

*Third*, Relator objects to the Court's ruling during trial permitting Defendants to call a sur-rebuttal witness, Mr. Yarham. ECF No. 250-1 at 10. As the Court ruled during trial, Mr. Yarham's testimony was fair sur-rebuttal to the rebuttal testimony of Mr. Klein, which Relator argued established materiality. Nor was there unfair surprise; as discussed above, Defendants advised Relator in advance and in writing, despite not being required to do so, of their intent to offer such sur-rebuttal testimony in the event Mr. Klein testified on rebuttal. There was no error and no unfair prejudice.

*Fourth*, Relator contends that the Court erred in "artificially limiting the testimony of Relator's rebuttal witness, Mr. Klein, to exclude any discussion of materiality." ECF No. 250-1 at 11. The Court did no such thing. Relator's brief cites, as the Court's erroneous ruling, Exhibit F to the Canni Declaration at certain page and line numbers, none of which

---

[7]     Relator's post-trial motion does not explain why Relator declined to call in its rebuttal case the witnesses that it now describes as "critical." Although Relator might argue that the time limits (of 17 hours per side) imposed in this case precluded Relator from calling additional witnesses, the Court notes that these time limits were imposed by the Court with the Parties' agreement, *before* the Court excluded the witnesses at issue from Relator's case-in-chief. *See* ECF No. 190 (minutes of pretrial conference on May 23, 2024 imposing time limits of 17 hours per side); ECF No. 217 (Tr. of May 23, 2024 Pretrial Conference) at 49:8-50:22 (Relator's agreement to time limits). Relator would have been subject to these time limits whether it called the witnesses in its case-in-chief or rebuttal case.

correspond to a discussion of Mr. Klein. As discussed above, prior to Relator calling Mr. Klein to testify, the Court offered tentative rulings on the scope of admissible rebuttal testimony; but made clear that it would rule on objections in the context of testimony actually elicited at trial. The Court did not preclude rebuttal evidence from Mr. Klein.

*Fifth*, Relator contends that the Court "erred in allowing Defendants to present evidence and argument to the jury that WOSB representations are only material in the set-aside context, for certain NAICS codes designed for set-asides or for service contracts only." ECF No. 250-1 at 11. Relator's post-trial motions cite several portions of the trial record. However, those portions contain only a single objection actually posed by Relator, ECF No. 250-7 (Canni Decl. Ex. E, Rough Tr. of Oct. 31, 2024) at 55:5-7, and that objection (which was overruled) to a question posed to Mr. Tuttle was based on lack of personal knowledge, which is not an objection advanced in Relator's post-trial motion. Relator has not established error or prejudice.

*Sixth*, Relator objects to the Court's overruling of Relator's challenge to Defendants' exercise of peremptory strikes during jury selection. ECF No. 250-1 at 15. In ruling on such a challenge, a district court applies a three-part framework: (1) the defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race (or ethnicity or gender); (2) if the defendant makes such a showing, the government must offer a race-neutral (or ethnicity-neutral or gender-neutral) basis for striking the juror in question; and (3) the district court must determine whether the defendant has shown purposeful discrimination. *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003) (race); *accord United States v. Hernandez-Garcia*, 44 F.4th 1157, 1166 (9th Cir. 2022); *see also United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000) (ethnicity); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994) (gender). At trial, Relator offered no argument whatsoever in support of a challenge—indeed, it was only when the Court asked for clarification that Relator's counsel elucidated that he was making a challenge at all; and even then, counsel suggested that having raised the issue it was deferring to the Court. The

19-cv-1249-RSH-MSB

Court took the comments of Relator's counsel at face value. After an apparent change of mind, Relator's post-trial motion presses that challenge, and asserts that the reasons given by Defendants were "pretextual," without argument or explanation why they were allegedly pretextual. ECF No. 250-1 at 16. The Court credits the non-discriminatory reasons given. Prospective Juror 11 had initially stated that he could not be fair; although the Court overruled Defendants' challenge for cause, there was a legitimate reason to exercise a peremptory challenge. Prospective Juror 4 had described being treated for chronic pain and suffering side effects of drowsiness; Defendants could legitimately be concerned that about his inability to pay attention. Defendants' reasons for exercising a peremptory as to Prospective Juror 9,—based on his surmised vocational or educational background, as well as his separation from his wife in a case in which one of Defendant's key witnesses, Mr. Tuttle, was to give extensive and favorable testimony about his deceased wife—was also not discriminatory or pretextual.[8] Relator did not and has not carried his burden of proving purposeful discrimination.

*Seventh*, Relator objects to the Court's refusal to excuse for cause a juror whose spouse had played golf with Defendant's counsel. ECF No. 250-1 at 16. As discussed above, although the prospective juror expressed discomfort with the fact that her spouse had played golf with counsel, she was clear from the outset that she would not be influenced in her role as a juror, and that she could and would be completely impartial. "A juror's

---

[8]    The eight jurors who were selected had the following occupations: special education teaching assistant (Prospective Juror 2); respiratory therapist (Prospective Juror 5); associate director of procurement for a biotechnology company (Prospective Juror 8); registered nurse (Prospective Juror 10); scientist (Prospective Juror 12); retired from position as vice president of a financial services company (Prospective Juror 13); supervisory intelligence analyst (Prospective Juror 15); and registered nurse (Prospective Juror 16). Prospective Jurors 10 and 12 stated that they were divorced. It is unknown whether Defendants would have exercised peremptory challenges as to these individuals; Defendants exercised their third and last peremptory challenge on Prospective Juror 11.

initial impressions or initial bias may be irrelevant, at the trial judge's discretion, when that juror commits to lay aside those feelings and reach a verdict based on the evidence presented and the court's instructions." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1220 (9th Cir. 1997). Determination of impartiality or bias in a prospective juror is "particularly within the province of the trial judge." *Ristaino v. Ross*, 424 U.S. 589, 595 (1976) (internal quotation marks and citation omitted). Here, the prospective juror made a commitment to set aside any feelings of discomfort and be completely fair to both sides, and the Court credits her commitment and concludes that she was not biased. There was no error.

*Eighth*, Relator objects to the Court's purported exclusion of summary evidence offered by Relator pursuant to Fed. R. Evid. 1006. ECF No. 250-1 at 16. At the outset of trial, Relator noted that Relator had recently added to its exhibit list certain "demonstrative exhibits," and that "our goal is to have them admitted and therefore go to the jury under [Rule] 1006 and at the very least to be able to use them as illustrative aids in the examination of witnesses and in closing arguments." ECF No. 250-4 (Canni Decl. Ex. B, Tr. of Oct. 28, 2024) at 6:6-19. The Court stated that, to the extent Relator sought to offer the charts as substantive evidence rather than as "true demonstratives," Relator was required to have disclosed and listed those charts with its other exhibits. *Id.* at 6:20-7:3. Relator's counsel stated, "Understood. We'll operate accordingly and try to figure out how … best to present that and to be used with the witness who comes up." *Id.* at 7:4-6. Relator never moved or offered the charts into evidence, did not endeavor to lay a foundation for those charts, and did not mark them for identification at the time of the colloquy. It is unknown to the Court precisely what these charts were, although Relator's brief states that it presented "versions" of these charts to the jury in closing. ECF No. 250-1 at 16. Relator did not, and does not, contest that all exhibits that a party wishes to offer into evidence are subject to the pretrial disclosure requirements of the Federal Rules of Civil Procedure and

the Civil Local Rules; nor does he contest that the exhibits at issue were not disclosed in a manner consistent with those rules. The Court finds no error.

*Ninth*, Relator objects to the Court's exclusion of Relator's anonymous letter of August 3, 2015 leveling accusations against Defendants. ECF No. 250-1 at 16-17. This letter, Trial Exhibit 30, was Relator's "initial (and anonymous) disclosure letter to the U.S. Government." *Id.* at 16. Relator does not cite or appear to attach the relevant portions of even the rough trial transcript, but its brief asserts that "the Court erred in excluding Trial Exhibit 30 … on the basis of hearsay and Rule 403 of the Federal Rules of Evidence, when (1) it was not offered for the truth of the matter asserted but as evidence Relator made the initial disclosure of Defendants' false statements to the U.S. Government, and (2) Defendants had already waived any Rule 403 objection as the Court had already admitted into evidence Trial Exhibit 44, a subsequent disclosure by Relator containing the same and similar allegations against Defendants." ECF No. 250-1 at 16-17. The Court does not follow this argument. Relator does not explain why proving that "Relator made the initial disclosure of Defendants' false statements to the U.S. Government"—the non-hearsay theory of relevance that Relator now asserts—has any bearing on the jury's verdict or on the new trial that Relator seeks. Similarly, Relator fails to explain how the Court's admission of a distinct document, Trial Exhibit 44, somehow means that Defendants waived the right to object to Trial Exhibit 30, or compelled the Court to admit Trial Exhibit 30. Relator again fails to show error or prejudice.

*Tenth*, Relator objects that the Court "erroneously permitted, over objection, cumulative and irrelevant testimony and argument concerning GET's revenues, allowing Defendants to improperly misdirect the jury regarding the relevance of GET's financial status and suggest its impending doom if the jury ruled against Defendants." ECF No. 250-1 at 17. Relator's post-trial brief cites several portions of the trial transcript, but those portions contain only a single objection:

Q [by Defendants' counsel]: On average, during your time at GET, what were the average gross revenues of the company?

A: 4 million.

Q: Now, I mentioned gross revenues. To get to net income, the actual income of the company, what would you – what calculations would have you to make?

MR. SPJUTE [Relator's counsel]: Objection, Your Honor. Relevance.

THE COURT: Overruled.

THE WITNESS: Well, all the costs that's required to produce a product. Payroll, taxes, insurance, cost of materials, keep the light duties on, overhead cost.

ECF No. 250-9 at Ex. G (Draft Trial Tr. at 63:23-64:8). Relator's actual objection at trial bears no relationship to the argument in its post-trial motion. GET's method of calculating net income is no way prejudicial to Relator, nor does it "suggest impending doom" if the jury ruled against Defendants. Instead, Defendants were entitled to offer evidence of the size of GET to establish that it was, as represented, a small business; as well as to support their contention that the majority owner, Ms. Guille Tuttle, played a significant role in the control of a small family-owned business even if she lacked a formal CEO title during the years at issue.

*Eleventh*, Relator objects to various rulings by the Court permitting reference to Plaintiff's prior owner. ECF No. 250-1 at 18-19. Relator writes, "despite the Court's prior indication that evidence regarding Rahim Sabadia would be excluded absent an affirmative Motion in Limine to the contrast (*see* Final Pretrial Conference Tr. 55:13-20 (May 23, 2014) (ECF No. 217)), the Court permitted repeated testimony and argument alluding to both." *Id.* at 19.

Relator misstates the Court's prior ruling. At the Final Pretrial Conference, the Court noted that Defendants' exhibit list "includes filings related to a criminal case of Mr. Sabadia that appears to have no connection to this lawsuit." ECF No. 217 at 55:14-16. The Court directed: "[I]f the defendants want to reserve the right to offer evidence of Mr. Sabadia's criminal conviction, I'm going to direct that the defendants use one of their in limine motions to address that issue." *Id.* at 55:17-20. Defendants did not file a motion in limine on this issue, and therefore they were precluded from offering evidence of Mr. Sabadia's criminal conviction. However, Defendants did not attempt to offer at trial any evidence of Mr. Sabadia's criminal conviction. Accordingly, the Court did not admit testimony at trial in a manner conflicting with its prior order.[9]

During the trial, Relator put at issue the intent of its own principal, Mr. Michael Carter, in reporting Defendants to the government and in ultimately bringing this lawsuit. During opening statements, Relator's counsel explained that Mr. Carter was "troubled" by the fact that Relator's competitor GET held itself out as a woman-owned small business while apparently being represented by men during trade shows. Relator's counsel also stated that Mr. Carter had been married to his wife for 40 years, and ran a "family business"

---

[9]    In addition to making this misstatement in Relator's post-trial motion concerning the Court's earlier ruling, Relator made the same misstatement more than once during trial. *See* ECF No. 250-4 (Canni Decl. Ex. B, Rough Tr. of Oct. 28, 2024) at 12:2-5 ([Relator's counsel:] "Your Honor, my only comment on that is the former owner's name is Sabtech, and that's part of the motion in limine that we handled with the Court. The Court excluded any references to the former owner."); *id.* at 13:20-23 ("We raised the issue with you at the hearing and you instructed them that if they intended to reference … Rahim Sabadia or Sabtech that they would need to file a motion in limine."). The Court promptly corrected Relator's counsel: "[I]f I remember correctly, Mr. Canni, my instructions – this is at the pretrial conference – were that if the defendants intend to bring in evidence of Mr. Sabadia's criminal record, that they would need to in limine that, but I don't think I presumptively [prohibited] them from referring to the name of the company." *Id.* at 13:3-8. Despite this correction, and despite having the official transcript of this hearing at its disposal, Relator continues to misrepresent the Court's prior ruling.

that employs his niece and sister, among others. Consistent with the themes of this opening statement, Relator's counsel elicited testimony from Mr. Carter that he brought GET to the attention of federal agencies because he "couldn't remain quiet," and because GET's misrepresentations were "taking away business from other legitimate woman-owned small businesses." Counsel asked why this issue was "so near and dear to you." Mr. Carter explained, "I have daughters and other women that are within my company. They may one day want to own their own businesses and run their own businesses…. So I have daughters, I have a niece, I have a sister who are women, who are fully capable of running their own business. I have four granddaughters. I don't like to see programs subverted. It's not right."

Strictly speaking, Mr. Carter's motivations for bringing this lawsuit were not relevant to any claim or defense available at trial. That testimony haven been given, however, Defendants were entitled to cross-examine him, to explore questions of bias and interest, and to seek to impeach his asserted reasons for bringing the lawsuit. This is precisely what defense counsel did. Counsel elicited from Mr. Carter that Relator and GET were direct competitors, and that that their history of competition went back many years— even to a time period before Mr. Carter owned Relator, during which he was an employee of Mr. Sabadia's company Sabtech. In this context, Defendants were also permitted to inquire as to the fact that Mr. Carter acquired Sabtech after it had been debarred from government contracting:

> Q: When you bought Sabtech Industries, had Sabtech Industries been suspended from Government contracting at that time?
>
> MR. CANNI: This I have – Your Honor, this is all irrelevant. It's a prior owner, and the Court has already ruled on this topic. He's just trying to prejudice the Court.
>
> MR. PATE: Your Honor –
>
> THE COURT: I have not ruled on the question that Mr. Pate has asked. Objection's overruled. You can answer the question, Mr. Carter.

THE WITNESS: Yes. The company had been suspended.

ECF No. 250-5 (Canni Decl. Ex. C, Rough Tr. of Oct. 28, 2024) at 109:21-110:7. It was clear that the question was whether Relator's predecessor, not Relator itself, had been suspended. The longstanding history of rivalry between the two companies, the fact that Mr. Carter purchased the company from its previous owner after its own suspension setback, and the fact that he was acquainted with the business disruption that results from such a government action, was of at least some relevance to allowing the jury to assess his credibility as a witness, including his motives and the veracity of his statements that he reported and sued GET in order to vindicate the rights of women.

The citations in Relator's post-trial motion indicate that it also objects to the following exchange, in which Mr. Tuttle was examined by Defendants in their case-in-chief:

> Q: Do you recall ever being contacted at your home by someone associated with Sabtech?
>
> A: I don't know how to answer that. Two times a person named Rahim Sabadia – I think that's how you say his name – called the house, but they spoke to Guille.
>
> Q: And do you recall what the subject was of that phone call?
>
> A: There was two phone calls. The first one was –
>
> MR. SPJUTE: Objection, Your Honor. Calls for hearsay.
>
> THE COURT: Well, the question was the subject matter of the phone call.
>
> So, Mr. Tuttle, you can answer the question as to the subject matter, but I don't wany you for this question to go into the details of what anybody said. The general subject matter.

THE WITNESS: Okay. The first one, the subject matter was basically sharing customers, you'd call it; and the second phone call was him threatening legal action if Guille hired an employee that had just been released.

ECF No 250-9 at 15:21-16:15. The Court thereafter *sustained* Relator's objections to a line of questions about why Mr. Tuttle believed that Mr. Sabadia called Ms. Tuttle. *Id.* at 16:25-18:2. The Court finds no error in admitting the testimony that Mr. Tuttle provided above, which was not hearsay, or in the other passages identified by Relator in its post-trial motion.[10]

*Twelfth*, Relator objects to the Court permitting references to GET's prior owner, Ms. Guille Tuttle, who was initially named as a defendant but passed away during the lawsuit. ECF No. 250-1 at 19-20. Relator's post-trial motion cites numerous excerpts of trial testimony, but few include objections from Relator that were overruled. The first is as follows:

Q: Describe for me just generally how Guille was able to battle through lupus for a lengthy period of time.

MR. SPJUTE: Objection, Your Honor. Relevance.

THE COURT: Overruled.

THE WITNESS: Well, she lived very strong, very strong willed and she always wanted to get better to come back and run the company. Because as well as Mr. MacNeil ran it and as well as – as well as it was running at the time, it still needed her touch. She should – occasionally when she could she would go in and kind of grease skids I guess or make sure that everybody was doing the processes that she had established and was still doing things the same way as she had set them up.

---

[10]   Relator also cites ECF No. 250-10 at 103:13-19; however, that portion of testimony does not appear to relate to Mr. Sabadia in any manner.

ECF No. 250-9 (Canni Decl. Ex. G, Rough Tr. of Nov. 4, 2024) at 27:20-28:7. The fact that Ms. Tuttle suffered from lupus was not a surprise to the jurors; indeed, it was Relator's counsel who first mentioned during voir dire that she passed away after a long battle with that disease. Testimony from Ms. Tuttle's husband and co-owner about Ms. Tuttle's efforts to balance her management of that disease with her active role at GET was directly relevant to the issue of her control over the company during the relevant time period.

Relator's post-trial motion also objects to the following portion of Mr. Tuttle's direct examination, in which the Court overruled a single objection by Relator before sustaining further objections:

> Q: Now, briefly let's talk about Guille's [philanthropy], what she had done for the community. Can you list out – tell me about the historic buildings in El Cajon that Guille was involved with.
>
> MR. SPJUTE: Objection, Your Honor. Relevance and calls for a narrative.
>
> MR. PATE: They opened the door with Mr. Carter describing his philanthropic endeavors and it's relevant to her credibility and –
>
> THE COURT: Candidly, I don't think it's relevant, but the Relator asked Mr. Carter about it, so I'm going to give you a little bit of leeway, Mr. Pate.
>
> THE WITNESS: The main thing that she was most proud of, she scholarshipped [sic] about 45 students during her tenure, basically.
>
> Aside from – she funded the construction of the Alpine Community Center.
>
> BY MR. PATE:
> Q: How much did she contribute to the Alpine Community Center?
>
> A: In total, in several different [in]stallments, about 350,000.

Q: Is there a veteran war memorial in El Cajon that she was involved with?

MR. SPJUTE: Objection, Your Honor. Leading and relevance.

THE COURT: Sustained.

BY MR. PATE:
Q: Are you aware of other philanthropic efforts associated with veterans?

A: Yeah. She helped establish the Alpine Veterans Memorial Wall, which is also at the community center, which they have plaques memorializing local residents' military history.

Q: Briefly what about efforts to preserve historic buildings in El Cajon?

MR. SPJUTE: Objection, Your Honor. Relevance and leading.

THE COURT: I'm going to sustain that objection, Mr. Pate.

*Id.* at 31:3-32:16. As indicated by the Court, the question about Ms. Tuttle's philanthropy was a fair response to evidence that Relator had presented about its own principal's philanthropy. Relator had offered testimony from Mr. Carter about his "opportunities to give back to the community, to engage in . . . community work." Mr. Carter testified that he served on the Oak Grove School District in Santa Clara County; that he was on two different board committees for raising money; and that together they raised over $50 million. Mr. Carter explained that the funds were used to upgrade the safety of schools, the computer systems, the bathrooms, and also to install emergency communications systems. Mr. Carter was also asked about what he considered his greatest accomplishment over his 40-year career, and he answered that it was providing an environment where people could attain their personal goals, adding that he has "created thousands and thousands of jobs, not just in California but throughout the U.S. and abroad." Relator's claims under the False Claims Act put into issue the mental state—including knowledge of falsity—of the

Defendants, not that of the Relator; evidence of Ms. Tuttle's philanthropic acts and state of mind were arguably more relevant to the trial than evidence of Mr. Carter's. The jury having heard evidence of Mr. Carter's philanthropy, there was no error or prejudice in allowing them to hear the same, within limits, about Ms. Tuttle.

Finally, Relator objects to the following exchange during Mr. Tuttle's direct examination:

> Q: Do you recall any other processes that Guille started in the very beginning that the company continued to use up until the point you departed some 35 years later?
>
> A: Yeah –
>
> MR. SPJUTE: Objection, Your Honor. This calls for cumulative evidence.
>
> THE COURT: Overruled.
>
> THE WITNESS: What does that mean?
>
> THE COURT: That means you can answer the question.
>
> THE WITNESS: Okay. Thank you.
>
> There were – travelers were one that she created at the beginning of time. So every product that we made would have a traveler along with these serial numbers that we're speaking of. Serial numbers was another thing. Every single product we had had a part number, a serial number. So through this part number, serial number, you had a traveler.
>
> You could track from the beginning of time where – who touched that product, who manufactured it, who tested it, who did the quality on it, from beginning to end. And then also once it ships, you know which company it went to. You could tell for RMAs how many times it's been back, if it has been back ever; if it's still under warranty, warranty status.
>
> There's a lot more, I'm sure, but –

1

2    ECF No. 250-9 at 41:2-42:1. The question did not call for cumulative evidence. There was

3    no error or prejudice.

4    The grounds listed above neither individually not collectively establish a basis for

5    granting a new trial.

6    *2.    Jury instructions*

7    Relator argues that the Court made two errors in connection with jury instructions,

8    on (1) materiality and (2) the presumed loss rule.

9    First, Relator alleges that the Court erred in declining Relator's proposed instruction

10   on materiality, "Relator's Proposed Instruction No. 49," at ECF No. 197 at 72-74. Relator

11   argues in its post-trial motion: "Relator specifically requested an instruction on materiality

12   that expressed that materiality could be demonstrated by the actions of the government in

13   bringing enforcement actions following discovery of the conduct." ECF No. 250-1 at 13.

14   Relator's proposed instruction stated:

15   > If a false statement has a natural tendency to influence or is
16   > capable of influencing a decision to enter into a contract or subcontract,
17   > that false statement is material.

18   > Materiality also can be demonstrated by the actions of the
     > Government or Prime Contractors in several ways, including reliance
19   > on the false statement (a) to comply with congressionally mandated
     > contracting goals, (b) to satisfy material contract terms such as terms
20   > requiring small business subcontracting plans, (c) to bring
     > administrative or criminal enforcement actions or (d) where the
21   > contractor is on notice that the particular false statement may subject
22   > the contractor to penalties.

23   ECF No. 197 at p. 67. Defendants argue that there was no factual basis for such an

24   instruction; there was indisputably no "criminal enforcement action," and the inquiries and

25   letters from government bodies—which were the product of Relator's accusations but did

26

27

28

34

19-cv-1249-RSH-MSB

not result in suspension or debarment—did not amount to an "administrative enforcement action." ECF No. 257 at 6-7.

Relator's proposed instruction was an inaccurate and misleading statement of the law. The first paragraph of Relator's proposed instruction was accurate and substantially similar to the instruction actually given by the Court. But the second paragraph, in beginning with the words "Materiality can *also* be demonstrated by … ," implied that that paragraph listed additional or alternative ways to establish materiality beyond the definition contained in the first paragraph—in other words, that the statutory definition of materiality was simply one way, but not the only way, to establish materiality. This rendered the proposed instruction erroneous. The proposed instruction also implied that government reliance on the false statement in any of the circumstances described in (a) through (d) could be itself sufficient, without anything more, to "demonstrat[e]" materiality. Relator offers no support for such a proposition of law. Finally, whether or not GET's course of communication with the Navy or the SBA amounted to an "administrative enforcement action," there was no evidentiary basis for other portions of the proposed instruction, including those that described government reliance on false statements "to satisfy material contract terms such as terms requiring small business subcontracting plans" or "to bring … criminal enforcement actions." The Court was not required to *sua sponte* re-write Relator's proposed instruction to make it legally accurate and to make it correspond to the evidence, where Relator made no effort to do so; instead, the Court gave an instruction accurately providing the statutory definition.

Relator's post-trial motion relies on two cases relating to materiality. ECF No. 250-1 at 13. In the first, *United States ex rel. Rose v. Stephens Institute*, 909 F.3d 1012, 1020 (9th Cir. 2018), the Ninth Circuit upheld a district court's denial of summary judgment to the defendant (on a certified interlocutory appeal), determining that the evidence precluded summary judgment. That evidence included, among other things, the past enforcement activity of the Department of Education: "A reasonable trier of fact could find materiality

here because the Department's payment was conditioned on compliance with the incentive compensation ban, because of the Department's past enforcement activities, and because of the substantial size of the forbidden incentive payments." *Id.* That case did not address jury instructions. The fact that the Ninth Circuit considered the government's past enforcement activities as one type of evidence that was material to upholding the denial of summary judgment in that case is a far cry from establishing that Relator was entitled to his requested jury instruction in this case. Relator also cites *UPPI LLC v. Cardinal Health*, No. 21-35905, 2022 WL 3594081, at *4 (9th Cir. Aug. 23, 2022), in which the Ninth Circuit reversed a district court's denial of a Rule 12(b)(6) motion to dismiss, where among other things the complaint "included allegations that the government has terminated contracts or prosecuted these kinds of violations in the past, including against [one of the defendants], providing at least modest support for materiality under this factor." Again, this decision regarding pleadings does not entitle Relator to his requested jury instruction, which was inaccurate and unsupported by the evidence.

Second, Relator argues that the Court erred in refusing to give Relator's proposed instruction on the presumed loss rule. ECF Nos. 250-1 at 14. As discussed above, the rule applies to a contract or agreement "which is set aside, reserved, or otherwise classified as intended for award to … WOSBs." 13 C.F.R. § 127.700. Relator does not argue that GET's contracts were "set aside" or "reserved" for WOSBs, but rather that they were "otherwise classified as intended for award to … WOSBs." Relator argues in its post-trial motion, as it did at trial, that the evidence supporting this conclusion is that on the contracts themselves, government officials checked the box for women-owned small business. But Relator does not respond to the reasoning given by the Court at trial: "the fact that a contract is awarded and that the Government customer indicates that the contractor is a women-owned small business is simply not the same as that contract being classified as intended for award to a women-owned small business." ECF No. 250-9 (Canni Decl. Ex. G, Rough Tr. of Nov. 5, 2024) at 120:14-18. In other words, evidence that the government awarded

a contract to a vendor it characterized as a WOSB does not alone establish that that the contract was classified as being intended for award to a WOSB—a factual predicate that relates to steps the government took (classification of the contract in a certain way) before the contract was awarded. There was an insufficient factual basis for giving an instruction on the presumed loss rule.

Additionally, Relator's proposed instruction on the presumed loss rule, ECF No. 197 at p. 84, was an incorrect statement of the law. That instruction stated: "The presumed loss rule provides that you must find damages equivalent to the total amount of the claims submitted to the Government and/or Prime Contractors where GET willfully sought and received a contract or subcontract awarded by representing itself as a WOSB in violation of the civil False Claims Act." *Id.* That proposed instruction ignores the triggering condition of the presumed loss rule: that there is a contract "which is set aside, reserved, or otherwise classified as intended for award to … WOSBs." 13 C.F.R. § 127.700. Relator's proposed instruction would take that factual question away from the jury and have the Court determine it as a matter of law.

Furthermore, there was no prejudice to Relator in failing to give an instruction on the presumed loss rule. By its terms, the rule relates to computation of *losses* rather than determination of liability. The jury instructions given by the Court on the elements of the claims did not require the jury to determine that there were losses or damages as an element of liability. ECF No. 240 at pp. 12-13. The jury returned a verdict in favor of Defendants on liability, and therefore did not reach the question of damages. ECF No. 244. Thus, the presumed loss rule was inapplicable.

Relator's post-trial motion reveals another motive behind requesting such an instruction: Relator wanted to use the instruction—which pertains to damages rather than liability—to also argue materiality to the jury. *See* ECF No. 250-1 at 14 ("[A]n instruction on the Presumed Loss Rule … would have impressed upon the jury the seriousness of the matter … which we submit would have further clarified the scope of materiality outside

the set-aside context ….”). That is, it appears that Relator wanted to argue to the jury that the instruction on the presumed loss rule indicated that false statements were material—treating the jury instruction as evidence. This would have been improper and inconsistent with the law.

The Court finds no error in failing to give the requested instructions.

### 3. Weight of the evidence

Finally, Relator argues that the verdict was against the clear weight of the evidence. Relator's argument is contained in a single, largely conclusory, paragraph that contains no citations to the trial record. ECF No. 250-1 at 20-21. Relator bore the burden of proof at trial, and bears an even greater burden in moving for a new trial. Relator has not met that burden.

The verdict was not contrary to the clear weight of the evidence. On the element of materiality, Relator did not offer testimony from a single witness who had transacted or considered transacting business with GET that GET's representation of its WOSB status was material or otherwise meaningful. On the element of scienter, Relator simply failed to establish that the Defendants had knowledge of the falsehood or otherwise acted with the requisite mental state. The falsehood at issue related to a legal definition involving two sets of regulations (the FAR and the SBA regulations), with changes during the relevant period; as previously stated by a prior district judge assigned to the case, "There … appears to be a great deal of confusion as to which statutory and/or regulatory definition(s) of a WOSB controls here, both because there are several definitions and because the majority of those definitions have been amended during the course of the relevant conduct. … The Parties have identified—and the Court has found—no authority clarifying the correct [legal] standard . . . here." ECF No. 115 at 21.[11]

---

[11]    The interpretation of the definition of "women-owned small business" is not among the legal issues presented in the post-trial motions.

1    Relator's motion for a new trial is accordingly denied.

2    **III.    DEFENDANTS' MOTION FOR FEES**

3        In a False Claims Act case brought by a relator, "[i]f the Government does not

4    proceed with the action and the person bringing the action conducts the action, the court

5    may award to the defendant its reasonable attorneys' fees and expenses if the defendant

6    prevails in the action and the court finds that the claim of the person bringing the action

7    was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment."

8    31 U.S.C. § 3730(d)(4).

9        "An action is clearly frivolous when the result is obvious or the appellant's

10    arguments of error are wholly without merit." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999,

11    1006 (9th Cir. 2002) (citations and internal quotation marks omitted). "An action is 'clearly

12    vexatious' or 'brought primarily for purposes of harassment' when the plaintiff pursues the

13    litigation with an improper purpose, such as to annoy or embarrass the defendant. *Id.*

14    (citations and internal quotation marks omitted). An award of fees under the False Claims

15    Act is "reserved for rare and special circumstances." *Id.* at 1007.

16        Defendants have not established such rare and special circumstances here. Relator's

17    lawsuit was neither clearly frivolous nor clearly vexatious. In arguing for an award of fees,

18    Defendants rely extensively on a recitation of the misdeeds of the *prior* owner of Relator,

19    Mr. Sabadia, and speculate that that prior owner still controls Relator. ECF No. 253 at 6.

20    Defendants also inappropriately speculate that that prior owner, in allegedly pursuing this

21    lawsuit, is motivated by a desire to harm the national security of the United States. *Id.* at

22    12. These allegations are unfounded.

23        Finally, Defendants seek to impose sanctions under Rule 11 of the Federal Rules of

24    Civil Procedure, arguing that Relator filed this action for an improper purpose. However,

25    Defendants do not dispute that they have failed to comply with the procedural requirements

26    under Rule 11(b) for such a sanctions motion. *See* Fed. R. Civ. Pro. 11(c) ("The motion

27    must be served under Rule 5, but it must not be filed or be presented to the court if the

28

challenged paper, claim, defense, contention, or denial is withdrawn or appropriate corrected within 21 days after service or within another time the court sets."). Defendants' request for fees is denied.

## IV.    CONCLUSION

For the foregoing reasons, Relator's Motion for a New Trial [ECF No. 250] and Defendants' Motion for Fees [ECF No. 253] are **DENIED**.

**IT IS SO ORDERED.**

Dated: February 4, 2025

_Robert S Huie_

Hon. Robert S. Huie
United States District Judge